## CHEEVER *v.* ELLIS.

1. Executors — Investment of Trust Funds — Accounting — Interest.

An executor who is charged by the will to keep trust funds invested in interest-bearing securities does not discharge his duty by returning the principal, without accounting for his failure to realize a profit.

2. Same—Responsibility of Executor—Employment of Agent.

An executor cannot relieve himself from all responsibility for the investment of trust funds by employing an agent in whom the testator had imposed great confidence.

3. Same—Annual Accounts—Allowance of Disbursements.

Items of disbursements allowed in an executor's annual accounts are binding upon the estate.

4. Same—Negligence—Res Judicata.

The allowance of an executor's annual account will not relieve him from the consequences of his negligence in making investments, nor prevent those having an interest in the estate from showing, on the final accounting, that he did not have the assets stated in his annual account.

5. SAME—COLLECTING ASSETS—LOSS—DILIGENCE.

An executor is not responsible for loss in collecting mort-
gages taken before his appointment, unless due to his want
of reasonable diligence.

6. SAME.

An executor is not liable for losses due to financial fluctu-
ations.

7. SAME.

An executor who executed a discharge of a mortgage, sent
it to his agent, and allowed the agent to keep the money,
without a settlement, for a year, when he failed, was guilty of
negligence, and liable to the estate for the loss.

8. SAME—FORECLOSURE OF TRUST MORTGAGE.

Where an executor allowed his agent to foreclose a mortgage
securing trust funds, take the deed in his name, and hold it
for four years, without accounting for the money, he was
liable to the estate for the loss caused by the agent's selling
the land and appropriating the proceeds.

9. SAME—FAILURE TO COLLECT INTEREST.

Where an executor loans money of the estate upon mortgages,
which he allows to run for nine years, without collecting
interest or foreclosing the mortgages, and the interest is lost
to the estate, he is liable therefor.

10. SAME—ACCOUNTING.

On his final accounting, an executor cannot claim that lands
conveyed by a debtor to him in trust to secure himself, the
estate, and other creditors, are assets of the estate.

Appeal from Washtenaw; Kinne, J.   Submitted No-
vember 19, 1902.   (Docket No. 110.)   Decided November
3, 1903.

Bill by Noah W. Cheever, individually and as special
administrator of the estate of Leonhard Gruner, deceased,
and others, against Caroline P. Ellis, individually and as
executrix of the last will and testament of Joseph J. Ellis,
deceased, Hudson P. Ellis, and John A. Ellis, for an
accounting.   From a decree for complainants, defendants
appeal.   Modified.

*Lawrence & Butterfield*, for complainants.

*Arthur Brown* (*T. A. Bogle*, of counsel), for defend-
ants.

HOOKER, C. J.   The bill in this cause was filed by Noah
W. Cheever as special administrator of the estate of
Leonhard Gruner, deceased, and in his own interest as
bondsman for said Gruner and his coexecutor of Joseph
J. Ellis, deceased, who died in 1886.   The other com-
plainants were also bondsmen.   At the time of Gruner's
death he was engaged in bitter litigation in probate court
over the settlement of the Ellis estate.   Gruner and Mrs.
Ellis, testator's widow, were coexecutors, and had filed
annual reports or accounts up to and including January 1,
1898, in which both joined, and these had been regularly
allowed by the probate court.   In September, 1899,
Gruner filed a final account, in which Mrs. Ellis refused
to join.   Objections to this account were filed by Hudson
P. Ellis, a son of Joseph J. Ellis; and soon after Mrs. Ellis
filed a paper purporting to be her account as coexecutor,
in which she alleged that she had at no time had any con-
trol over any of the property of the estate.   Gruner filed
exceptions to this paper, and the parties entered upon a
prolonged contest over Gruner's account.   Before the
hearing commenced, Mrs. Ellis and Hudson P. Ellis
joined in a petition for the removal of Gruner.   The
Ellises also filed a petition for a partial distribution of the
estate, and the court ordered Gruner to give an additional
bond in the sum of $75,000, which order was complied
with.   All of the issues raised by these various papers
were pending when Gruner's account came on to be heard,
and proofs were taken until the death of Gruner by suicide
occurred.   Cheever was then appointed administrator of
Gruner's estate, and filed the bill in this cause.

Joseph J. Ellis was a resident of Ann Arbor, where he
made the acquaintance of Myron H. French, who removed
from Ann Arbor to West Branch, in Ogemaw county,
when he engaged in the banking business and the loaning
of money.   The bank was conducted under the name of
Myron H. French & Co.   Ellis put $5,000 into this busi-
ness, thereby becoming a copartner of French; and he
also permitted or employed French to make loans for him

upon real-estate mortgages, and perhaps other securities, in that county. These loans began in 1883, and continued up to the time of Ellis' death, when the amount of money thus invested had reached an aggregate of $35,000, or thereabouts. After the death of Ellis, two mortgages were given by French to Mrs. Ellis, for $5,000 each, which, by mutual agreement between them and Gruner, she was to accept as a payment upon her share of her husband's estate. These mortgages were given for the interest in the banking business owned by Ellis, and $5,000 in cash furnished from the estate. The will of Ellis made bequests payment of which was to be deferred for several years, and made his executors trustees in relation thereto; and the executors continued to permit French to represent the estate in the collection of loans, and made other loans through him, up to about the time of his failure, which occurred in 1898.

The controversy in probate court related principally to losses sustained by the estate through French, which Hudson P. Ellis and his mother charge in whole or in part to the negligence of Gruner; and this controversy is transferred by this bill to the court of chancery, and the parties have seemed content to litigate it in this case. The meritorious question is how much, if anything, should be charged against Gruner for the losses which he has caused or failed to prevent. The bill prays a receiver to take charge of $15,000 belonging to the estate of Ellis, which came to Cheever's hands on his intestate's death; that Hudson P. and Caroline P. Ellis be required to account for their management of the affairs of the Ellis estate, with a list of property within their possession or knowledge; that an account stated by the bill be decreed to be a complete account of the administration of the Ellis estate, so far as Gruner is concerned, and that his estate and complainants be discharged from further liability in relation thereto; that other suits be restrained; and that the rights of the parties to certain property described in the bill be determined.

The cause was heard upon pleadings and proofs taken in open court. The account of Gruner was amended at the hearing, and it was allowed as amended. The learned circuit judge states, in an opinion filed, that "the only issues involved in this suit grow out of the management of the Ogemaw securities," and "the question is presented to what extent, if any, Mr. Gruner should be held responsible for the losses, if any, which have been incurred in that county. * * * The proposition is now made that Mr. Gruner should be held responsible for whatever losses came to the Ellis estate through the instrumentality of Mr. French."

At the time this bill was filed, the final account of the executor had been filed, and the parties were engaged in taking proofs relating thereto in probate court; the same having been interrupted by the death of the executor, Gruner. Both parties seem to have been willing to transfer this accounting to the court of chancery, and, while we doubt whether this was a competent practice if objected to seasonably, the face of the bill probably shows jurisdiction, and, as it has not been questioned, we dispose of the case upon its merits.

The complainants' counsel state, and defendants' counsel concede, that the determination of three questions should settle this case, viz. :

1. Did Mr. Gruner exercise reasonable care?
2. Did any loss occur?
3. Did H. P. Ellis compromise?

The will directed the executors to sell and dispose of such part of the estate as they should deem for the best interests of the beneficiaries, and "invest the proceeds in *secure interest-bearing bonds and mortgages*, or other *safe and reliable interest-bearing securities*," and "*to keep the legacies to my sons safely invested in good and reliable interest-bearing securities*." Apparently the executor, Gruner, attempted to do this, and the evidence leaves as little doubt that he failed to do so in regard

to the funds invested in Ogemaw county. It is said that he never sent any of the money of the estate to that county, and the circuit court has so found. Counsel contend that Ellis himself invested money aggregating nearly $38,000, of which $24,000 was realized in cash, and that there are securities in the administrator's hands for more than the remaining indebtedness. This is not a sufficient answer to the defendants' claim. Gruner's control began in 1886, and from that time he was legally charged, with his coexecutor, with the duty of investing this fund for the benefit of the estate as fast as it was paid in, and of collecting the securities as fast as they became due, if collectible, if the interests of the beneficiaries required it. There is no doubt that he should be allowed to treat as credits any securities taken by Ellis which were entirely worthless, and such as are yet outstanding which reasonable business prudence justified his omission or failure to collect; but it is not a complete answer for him to say, "I have here the principal that has been invested, and I am not to be held accountable for a failure to realize a profit on that sum." Nor is it an answer to say that Ellis had great confidence in French, and recommended him to Gruner as worthy of full confidence, thereby "justifying entire confidence on the part of Gruner," and excusing him in leaving the estate's interests in Ogemaw county entirely in his hands. He ( Gruner), not French, was the executor. The complainant claims pay for his services as such; and, while he may have been justified in employing French as an agent, and in relying upon his representations to a necessary and reasonable extent, it would be going too far to say that he could divest himself of all responsibility regarding his trust by employing French to act in his stead.

After the appointment of Gruner, there came to his hands a large number of Ogemaw county mortgages. These had been negotiated by French, and were made payable at the bank of French & Co. (*i. e.*, French and Ellis), at West Branch. It had been the custom of Ellis to collect money due, through French. It has been

already stated that Ellis was a copartner in the bank. There also came to the hands of the executors a mortgage given by French to Ellis. It was conditioned as follows:

" This mortgage is given to indemnify the said Ellis against all loss or harm by reason of engaging in copartnership with the said French, and is intended to protect and secure said Ellis for all moneys and securities that may be intrusted to said French, either by himself or by others, whereby said Ellis would be jointly responsible, and also to protect said Ellis and insure the payment by said French of his share of the losses, if any occur, in the business of said copartnership at West Branch, Ogemaw county, in banking and brokerage."

"*Provided always*, and these presents are upon this express condition, that if the said parties of the first part shall and do well and truly pay, or cause to be paid, to the said party of the second part, all his share of the losses, if any arise, in the copartnership between the said French and the said Ellis at West Branch, Ogemaw county, promptly and upon demand, and shall also faithfully account to said Ellis for all moneys and securities which may come into his hands as a member of said copartnership or as the agent of said Ellis, and pay over the same on demand, and shall promptly meet and pay his share of all the losses as aforesaid, if any occur (said parties having formed a copartnership for banking purposes aforesaid), then these presents shall cease and be null and void. But in case of nonpayment of the said losses, or in case of a default in a faithful accounting and payment as aforesaid, at the time, in the manner, and at the place above limited and specified for the payment thereof, then and in such case," etc.

A year or so after Ellis' death there was a conference, at which the. Ogemaw interests were discussed. At this conference, Mrs. Ellis, H. P. Ellis (then a minor), French, Cheever, and Gruner were present. It was then agreed to close out the copartnership, and a proposition was made by French to take the Ellis interest, which was accepted. Mrs. Ellis agreed to make him a loan of $10,000, and two $5,000 mortgages were executed by French and wife to her. This amount was charged to Mrs. Ellis by the estate, and the Ellis interest in the bank passed to French, and he

received $5,000 additional from the estate in cash. The indemnity mortgage was released. It is claimed, and there is some evidence tending to show, that it was then understood that French should continue to act for the executors as he had for Ellis in relation to the mortgages. At all events, he was allowed to do so and the contestants acquiesced.

There appears to have been a difference in the value of lands in different sections of Ogemaw county,—some, called "plains land," being sandy; and while expectations that it would be found valuable may have prevailed for a time, and perhaps were indulged by French and Ellis, and possibly by Gruner, these expectations were not realized, and before 1890 Gruner directed French to take no more plains-land securities. Beginning about the year 1893 the Ogemaw lands depreciated in value, and it was difficult to sell them at any price. It is ascribed to a financial depression which pervaded the country at that time. French made collections upon some of the mortgages taken by Ellis, and in some instances either reloaned the money, or sent other mortgages already in his possession to Gruner, who accepted them. Some of these mortgages were upon plains land, and are claimed to have been worthless, or inadequate security for the amounts represented by them. Some of the money collected was appropriated by French, and withheld for a long time, or never paid. French engaged in many enterprises and investments, and his affairs culminated in his failure in 1898. Thereupon Hudson P. Ellis saw him, and obtained some security from him on behalf of the estate, which we need not discuss in detail at this point.

The want of reasonable care relied upon by contestants is summarized in the brief as follows:

1. "He never made any sufficient investigation as to the character, identity, location, productive qualities, or title of the Ogemaw securities, but, on the other hand, left everything in that connection wholly to the discretion of his agent, French."

2. The release of the indemnity mortgage, and failure to take any other.

3. Neglect to heed admonitions of French's waning finances and consequent embarrassment.

4. Negligence in sending discharges to French, and omission to require account of the same.

5. Failure to know that mortgages were foreclosed and bid off by French without payment to the estate.

6. Omission to collect past-due paper and interest.

7. Report in annual accounts of mortgages which had in fact been discharged or foreclosed, and wholly lost, or paid to French.

8. Consent to reduction of the rate of interest on mortgages.

9. Failure to give personal supervision to Ogemaw loans.

10. Same as No. 3.

11. Leaving $1,000 due estate in hands of French, and accepting worthless bank stock as security for same.

Contestants' brief contains a formidable array of circumstances in support of these claims.

Counsel for the contestants have called attention to a large number of specific items upon which they claim loss. Upon the other hand, counsel for the complainants confine their discussion to the general question of whether there has been a loss, without attempting to show that the testimony does not sustain the claims of opposing counsel as to these items. It seems to have been conclusively proven that the mortgages represented by these items came to the hands of the executor, and that they were not paid, and we find nothing to indicate that the loss was made good to the estate by the executor. It is clear that the estate's money went into these items, and never came out, and was therefore lost, with the interest that it should have earned. We cannot escape the conclusion that Mr. Gruner was exceedingly lax in his supervision of these dealings. Apparently, he had occasional periods of anxiety, but appears to have done nothing more than to urge French to collect, and to have implicitly believed and relied upon his representations in all things, or to have lacked the force of character to control or supersede

him. Consequently he was cheated by French in various ways. Worthless land was imposed upon him, excessive loans were made, collections were not reported, and in various ways the estate was depleted. The losses upon the earlier securities may have been in part due to a shrinkage in values, for which neither Gruner nor French was to blame; but this does not excuse losses upoh later loans. We think that the contestants have just cause to complain, and are not surprised at some impatience upon the part of the beneficiaries, who confront the condition of a large fortune lost through the coincidence of French's want of honesty and Gruner's inattention to his duty.

The claim that these losses were compromised by H. P. Ellis is not sustained in the proof. What he did was done with the approval of Gruner, and resulted to his advantage. The claim that the annual accounting precludes inquiry into these losses, upon the ground that they were adjudications approving what had been done, and thereby binding the estate, should not prevail. These annual reports consisted of credits to the executor, and charges against him. So far as his disbursements are concerned, no doubt the allowance of items bound the estate; but his statement of assets ought not to bind the estate if he did not have them, or to cut off his responsibility if, owing to his negligence, they should prove worthless or not be collected. It now appears that he did not have all of the securities claimed, and that some of them were not worth what they were charged as representing, and that this was in whole or in part due to his negligence. It is therefore proper to investigate them, with a view to surcharging him with such deficiencies as are due to his negligence.

It is a difficult matter to state a rule by which all of these items shall be tested. Manifestly, Mr. Gruner was not to blame for the taking of mortgages prior to his appointment. He is responsible for no loss in collecting them, unless due to his want of reasonable diligence. He should not be expected to make good shrinkages due to financial fluctuations, unless his want of diligence in

omitting to collect earlier is a factor. On the other hand, he should have known when money became due, and whether it was paid. He should not have left it in the hands of French for any considerable periods, if he could reasonably make other use of it. If not, it might not be negligence, unless he had reason to fear his insolvency. If he knew that French was over-burdened and financially embarrassed, he should have taken steps to ascertain what, if anything, was due the estate, with a view to securing it. He should have kept the securities in his own possession, and have kept track of them when sent, with discharges, to French. He had some responsibility in relation to titles and values. Few men would have so fully and implicitly trusted so large interests to another for so long a period. Yet not a shadow of suspicion of Gruner's honesty of purpose is discoverable. He was evidently a confiding old man, a good citizen, worthy of better treatment and a better fate; and it is regrettable, and doubtless regretted by all concerned, that more consideration had not been shown him by those interested in pressing this claim against him, and their advisers and friends.

Counsel for the contestants have classified and tabulated the alleged losses as follows:

| | |
|---|---:|
| Items lost, but continued in account of 1898 | $9,962 64 |
| Losses through unauthorized settlements | 1,679 02 |
| Losses through taking junior mortgages | 8,303 50 |
| Investments on inadequate security | 5,984 83 |
| Losses from neglect to collect interest | 849 95 |
| Money collected by French and kept by him | 1,157 31 |
| Decrease in value accompanied by neglect to collect | 1,926 00 |
| Taxes paid on securities | 222 84 |
| Thayer mortgage matter | 150 00 |
| Interest on omitted items | 676 53 |
| Interest on unaccounted balances | 736 08 |
| Total | $31,648 70 |

They ask that the account be surcharged with these items.

## First Class.

The following items had become wholly lost to the estate before January 1, 1898, through the acts of Mr. Gruner, as executor, in discharging and thus losing the liens of said mortgages in some cases, and in foreclosing and thus losing the securities and property to the estate in others, as the several properties upon which such securities rested never became the property of the estate; namely:

| | | |
|---|---:|---:|
| The Sims mortgage, appearing in Mr. Gruner's report January 1, 1898 (discharged by Mr. Gruner January 19, 1897) | $783 38 | |
| Interest at 9 per cent. to April 5, 1901 | 229 36 | |
| | | $1,012 74 |
| The Stocken mortgage, appearing in Mr. Gruner's report January 1, 1898 (discharged by Mr. Gruner August 23, 1897). Amount actually due thereon July 1, 1899 | $815 00 | |
| Interest to April 5, 1901, at 6 per cent. | 61 12 | |
| | | 876 12 |
| The Darland mortgage, appearing in Mr. Gruner's report of January 1, 1898 (discharged by Mr. Gruner June 13, 1898) | $356 99 | |
| Interest to April 5, 1901, at 9 per cent. | 64 20 | |
| | | 421 19 |
| The Rose and Arnold mortgage, appearing in Mr. Gruner's report of January 1, 1898 (discharged March 8, 1895, by Mr. Gruner). Due July 1, 1899 | $650 66 | |
| Interest to April 5, 1901 | 16 62 | |
| | | 667 28 |
| The Woodiwiss mortgage, appearing in report of January 1, 1898 (foreclosed and sold March 2, 1894, bid off by French in his own name, and sold by him to Holdried). Principal April 25, 1899 | $325 00 | |
| Interest to April 5, 1901 | 490 00 | |
| | | 815 00 |
| The Morrison mortgage, appearing in report of January 1, 1898 (discharged October 22, 1896, by Mr. Gruner). Amount due November 1, 1894 | $400 00 | |
| Interest to April 5, 1901, at 8 per cent. | 202 66 | |
| | | 602 66 |
| Amount carried forward | | $4,394 99 |

| | | |
|---|---:|---:|
| Amount brought forward | | $4,394 99 |
| The Charles Woods mortgage, appearing in report of January 1, 1898 (discharged in 1893 by Mr. Gruner). Amount due June 28, 1898 | $58 43 | |
| Interest to April 5, 1901 | 11 72 | |
| | | 70 15 |
| The George Struble mortgage (discharged June 30, 1898). Discharge recorded, and security not brought into any report of Mr. Gruner subsequent to such discharge. Amount due at time of discharge | $187 25 | |
| Interest to April 5, 1901 | 29 95 | |
| | | 217 20 |
| Daniel W. Benjamin farm, appearing in the report of January 1, 1898. This mortgage was given in 1886 for | $1,500 00 | |
| Interest accumulated to January 1, 1898 | 900 30 | |
| Interest to April 5, 1901 | 400 00 | |
| | | 2,800 30 |
| The Peaver mortgage, appearing in the report of January 1, 1898 | $1,200 00 | |
| Interest accumulated to April 5, 1901 | 1,280 00 | |
| | | 2,480 00 |
| | | $9,962 64 |

## Second Class.

Mortgages were settled by Mr. Gruner, without order of court or authority of law, for less than was due, and the estate lost the following amounts, respectively, thereon:

| | |
|---|---:|
| Rogers mortgage | $76 27 |
| O'Conner mortgage | 56 99 |
| Burwell mortgage | 204 62 |
| Woughter mortgage | 42 64 |
| Mead mortgage | 139 84 |
| Peters mortgage | 46 14 |
| Kaltz mortgage | 27 22 |
| Parliament mortgage | 24 19 |
| Shellito mortgage | 74 01 |
| Decker mortgage | 52 48 |
| Decker mortgage | 298 83 |
| Schaible mortgage | 539 66 |
| Chambers mortgage | 96 13 |
| | $1,679 02 |

—With 6 per cent. additional interest from September 1, 1900, to date of payment.

## Third Class.

Mortgages upon which loss resulted from loaning money upon junior mortgages or defective titles:

| | |
|---|---:|
| Peach Lake and Furze farm loss | $6,525 16 |
| Marden mortgage loss | 398 50 |
| Hamilton mortgage loss | 598 76 |
| Goslin mortgage loss | 579 26 |
| Rentschler mortgage loss | 201 82 |
| | $8,303 50 |

## Fourth Class.

Losses by loaning upon insufficient security:

| | |
|---|---:|
| Stevens mortgage | $100 96 |
| Stanley mortgage | 492 04 |
| Hacht mortgage | 2,050 00 |
| Peach Lake and Furze farms | 6,525 16 |
| Rentschler mortgage | 201 82 |
| Marden mortgage | 398 50 |
| (The last three items occur in the list last above given.) | |
| Goslin mortgage | 579 26 |
| Zimmer house mortgage | 211 05 |
| C. P. Walker mortgage | 413 34 |
| L. F. Smith mortgage | 398 24 |
| Tranzo mortgage | 148 98 |
| Beach mortgage | 305 96 |
| Tawas Bank stock | 1,285 00 |
| | $13,110 31 |

## Fifth Class.

Losses resulting from negligence in collecting interest, and allowing it to accumulate to a point beyond the value of the property:

| | |
|---|---:|
| Abbott cottages | $219 71 |
| O'Clair mortgage | 175 95 |
| Hayes mortgage | 119 71 |
| Tschirhart mortgage | 177 58 |
| Stevens mortgage | 100 96 |
| Amount carried forward | $793 91 |

Amount brought forward___ ._____ $793 91
( The last item being also included in the list last above given.)
A. Abbott mortgage ____ _____ 157 00

                                              $950 91

## Sixth Class.

Money collected by French as agent or attorney of said Gruner, and allowed to remain in his hands, resulting in losses to the estate from that cause:

| | |
|---|---:|
| McCrimmon mortgage | $68 39 |
| Houston mortgage | 58 47 |
| Ranger mortgage | 35 20 |
| Link mortgage | 32 07 |
| Reed mortgage | 73 13 |
| Rohl mortgage | 92 89 |
| Jones mortgage | 156 99 |
| Maurer mortgage | 373 86 |
| Meir mortgage | 65 67 |
| J. P. Benjamin mortgage | 47 86 |
| Freed mortgage | 26 38 |
| Abbott Block rents | 126 40 |

                                        $1,157 31

## Seventh Class.

Losses on loans made by Ellis which became insufficient security because of decrease in value of property:

Ostrum mortgage_____ $1,926 00

## Eighth Class.

Moneys paid for back taxes and tax deeds upon lands covered by mortgages belonging to the estate, such payments and purchases having been made to protect the interest of the mortgagees, because the several amounts paid for these tax deeds and back taxes were upon property where the security held by the estate was already more than the value of the land upon which the security rested:

| | |
|---|---:|
| Abbott cottages | $6 25 |
| Green house | 6 80 |
| Goslin house | 4 08 |

      Amount carried forward _____ $17 13

| | | |
|---|---|---|
| Amount brought forward | $17 | 13 |
| Goslin farm | 11 | 55 |
| Goslin farm | 14 | 07 |
| Hiram Brooks farm | 24 | 60 |
| Hiram Brooks farm | 32 | 66 |
| Opera house | 15 | 43 |
| Shellito house | 8 | 93 |
| La Point house | 5 | 29 |
| E. and J. O'Clair | 26 | 35 |
| E. Hayes | 16 | 71 |
| C. J. McCrimmon | 12 | 20 |
| C. Beakney | 22 | 06 |
| C. Rentschler | 4 | 60 |
| L. Smith | 11 | 26 |
| | $222 | 84 |

### Ninth Class.

| | | |
|---|---|---|
| Thayer mortgage matter | $150 | 00 |

### Tenth Class.

Interest on two omitted items:

| | | |
|---|---|---|
| $131.03 from October 1, 1889 | $120 | 38 |
| $705.45 from January 1, 1891 | 556 | 15 |
| | $676 | 53 |

### Eleventh Class.

Defendants object to the allowance of the item credited to said Gruner as a disbursement to complainant Cheever during the years 1898 and 1899, amounting to $736.08, because complainants have not furnished defendants with an itemized list of said account, as asked for in defendants' exceptions, and, in the absence of such itemized statement, these defendants claim the court should disallow the whole bill.

| | | |
|---|---|---|
| The amount that defendants ask to have the executor's account surcharged with under this item is | $736 | 08 |

### Recapitulation of Losses.

| | | |
|---|---|---|
| Total loss enumerated under subdivision 1 | $9,962 | 64 |
| "        "        "        "        " 2 | 1,679 | 02 |
| "        "        "        "        " 3 | 8,303 | 50 |
| "        "        "        "        " 4 (less three items in subdivision 3) | 5,984 | 83 |
| Amount carried forward | $25,929 | 99 |

Amount brought forward _____$25,929 99
Total loss enumerated under subdivision 5 (less item of
   Stevens mentioned in subdivision 4)_____      849 95
Total loss enumerated under subdivision 6_____   1,157 31
  "     "     "     "     "    7_____   1,926 00
  "     "     "     "     "    8_____     222 84
  "     "     "     "     "    9_____     150 00
  "     "     "     "     "    10_____     676 53
  "     "     "     "     "    11_____     736 08

                                             $31,648 70

For convenience, we will consider the items referred to in classes, as suggested in the brief. The first class contains a list of mortgages for which the executor claimed credit in the account of 1898. That fact need have no especial significance for the present purpose, the more important inquiry being whether the estate is given credit for them in the account set up in the bill. We do not discover that complainants' brief claims this.

### First Class.

(*a*) Sims Mortgage. As to this, complainants' counsel stated on the hearing that he thought it was not included by them as an asset. This was given July 5, 1885, for $675. It was well secured. Interest was 9 per cent. In the annual account of 1898, Mr. Gruner reported this mortgage as a credit $783.38, and in September, 1899, $834.85 as due thereupon. The lesser sum is taken. On January 15, 1897, he executed a discharge of this mortgage, and sent it to French. It was recorded January 19th. Either the amount of this mortgage was *paid* over to Gruner, and it should not have *appeared* in the account, or it was not reported, and the money was with French. We understand that French never paid it over, or otherwise accounted for it. It was negligence to leave this matter unsettled from January 15, 1897, and it should be charged against the executor at the amount due January 15, 1897; that being the sum chargeable against French. Interest should be added at the legal rate from that date.

(*b*) The Stocken Mortgage. This was given June 15,

1888, for $500, for five years, at 10 per cent. It covered a house and lot in West Branch. Interest for four years, and $35, was paid upon it. On August 23, 1897, the mortgage and discharge were sent to French, and the latter was at once recorded. Gruner testified that he never received payment of it. He reported it as an asset in 1898, $693.96.

Amount due July 1, 1899 _____ $815 00
Interest to April 5, 1901 _____ 61 12
                                                         _____
                                                         $876 12

This item should be allowed, with interest at the legal rate after September 1, 1897, on amount then unpaid.

(c) Darland Mortgage. This was reported in January, 1898, at $356.99. It was given for $300, on 40 acres, April 13, 1891, at 8 per cent. French became owner of the land by purchase, and asked for a discharge of this mortgage, which was sent June 13, and recorded June 25, 1898. He then sold to Smith, and took back a mortgage to the Ellis estate for $410, and this was turned over as a new loan, independent of the Darland loan. The Darland loan was lost.

Due January 1, 1898_____ $356 99
Interest to April 5, 1901, at 6 per cent. _____ 64 20
                                                         _____
                                                         $421 19

This should be charged against the executor at the amount due June 25, 1898, with legal interest from that date.

(d) Rose and Arnold Mortgage. This mortgage was given March 30, 1890, for $800; interest, 9 per cent.; discharged March 8, 1895. Nothing was ever paid upon it, and Gruner did not know the facts regarding its disposition until after the failure of French, in July, 1898. He never inquired about it. Counsel claim as follows:

Due July 1, 1899_____ $650 66
Interest to April 5, 1901_____ 16 62
                                                         _____
                                                         $667 28

Like the former mortgages, it should be allowed at the amount due March 8, 1895, with lawful interest from that date.

(e) Woodiwiss Mortgage. This mortgage drew interest at 10 per cent. It was foreclosed, and the land sold to French, March 2, 1894. He sold it to Holdried in January, 1898. Only three years' interest was realized. The sheriff's deed was reported to Gruner in 1894, but he did not pay further attention to it, and French appropriated it. The executor should be charged with the amount received by French upon this land, with interest at the legal rate from date of such sale.

(f) Morrison Mortgage. This was a mortgage for $400, given November 1, 1890. It was discharged October 22, 1896. No part of principal or interest was paid, and all was lost. French collected it, and never accounted for it. Contestants claim as follows:

Due November 1, 1894 _____ $400 00
Interest to April 5, 1901, at 8 per cent. _____  202 66
                                                             _____
                                                             $602 66

The executor will be charged with the amount due upon November 1, 1894, with interest at the stipulated rate to October 22, 1896, and lawful rate on the amount from that date.

(g) Charles Woods Mortgage. This was given for $1,000 June 6, 1885, at 10 per cent., running three years. A discharge was recorded September 27, 1893. French continued to pay on this as late as 1898. In the September, 1899, account, he states that principal and interest were collected by French. Previously it was always reported as an asset, and in 1898 at $475.87.

Amount claimed to be due June 28, 1898 _____ $58 43
Interest to April 5, 1901 _____  11 72
                                                             _____
                                                             $70 15

The amount collected (i. e., $58.43) should be charged the executor, with interest at legal rate from June 28, 1898.

(*h*) George Struble Mortgage. Mortgage for $175. Discharged June 30, 1898. Stated to have been discharged in his 1899 account, but no debit for proceeds.

| | |
|---|---|
| Due at date of discharge | $187 25 · |
| Interest to April 5, 1901 | 29 95 |
| | ·$217 20 |

This item should be allowed.

(*i*) Benjamin Mortgage. $1,500; 10 per cent.; 1886. This mortgage was foreclosed by Gruner's direction, and bid in by French on October 24, 1891, in his own name. Nothing was paid by him. He took possession at once, and mortgaged the entire 160 acres to Knight for $1,400. He then sold 40 acres to Parliament, and procured a release from the Knight mortgage. Gruner first learned these facts, after the failure, through H. P. Ellis. French then deeded the 120 acres to the Ellis estate, subject to the Knight mortgage, upon which nothing had been paid. Claimed:

| | |
|---|---|
| Principal | $1,500 00 |
| Interest to January 1, 1898 | 900 30 |
| Interest to April 5, 1901 | 400 00 |
| | $2,800 30 |

This item will be charged against the executor at the amount realized by French from his mortgage and sales, with interest at lawful rate from dates of said mortgage and sales.

(*j*) Peaver Mortgage. This was given March 28, 1888, for $1,200, upon 160 acres of land, said to have been worth $1,500, and drew 8 per cent. On June 8, 1893, Gruner sent French a discharge, which was recorded June 10th. It appears that French had purchased the land from Peaver, and, after recording the discharge, traded it for other property. Mr. Gruner reported this regularly as an existing mortgage, and in his 1898 account at $2,019. He never received any money upon it, and testified that he made no inquiries about it; that he knew that more than

$2,000 was due upon it, did not know what had become of the property, and had never examined to see. When French sold the land after acquiring an unincumbered title, as stated, he took back a mortgage from Link, the purchaser, to himself, for $620. This mortgage he sent to Gruner as an independent loan. Gruner testified that it was probably in settlement of account, but was not to pay anything upon the Peaver mortgage, and the estate has realized nothing upon the Peaver mortgage. Amount claimed is:

Principal------------------------------------------------------- $1,200
Interest to April 5, 1901-------------------------------------- 1,280
                                                                  ———
                                                                 $2,480

This item should be charged to the executor at the amount due June 10, 1893. Interest should be computed at legal rate from that date.

From the foregoing it appears that in eight instances he sent discharges, and in two instances permitted foreclosures, without knowing that French had converted the property. This covered a period of 10 years,—the first being in 1888, and the last in 1898,—and it caused a loss to the estate of more than $9,000.

### Second Class.

The items contained in this class consist of alleged errors or concessions in settlement. The proof consists mainly of the testimony of Babbitt, who testifies to computations and losses. It does not satisfactorily appear how these discrepancies arise in the various cases. Many of the transactions involved are remote in point of time, and, if they were concessions, we are not satisfied that they were not wisely made. The items in this class will be disallowed.

### Third Class.

(*a*) Peach Lake Mortgage. After discharging the indemnity mortgage, Mrs. Ellis took two mortgages on the Peach Lake farm and other properties, including an opera

house in West Branch, in the deal relating to the copartnership. Gruner afterwards bought these mortgages for the estate, paying $7,750 for the same, besides some interest. The small properties were released at some stage of the proceedings, but it is not shown when. After French failed, H. P. Ellis learned that there was a prior mortgage of $1,500 on the opera house. He complained to French, and he and wife gave Cheever a deed of their homestead, which Cheever deeded to the estate. At the same time, Ellis, who had learned that title to several farms, upon which the estate held mortgages inadequately secured, was in French, induced French to quitclaim them and the opera house to the estate, the deed providing that the mortgages should not merge. It was afterwards learned that he had previously deeded the opera house to other parties. This left the security for the two $5,000 mortgages as follows: One was second to a $1,500 mortgage on the opera house, and the first mortgage on the Peach Lake farm. The other was third on the opera house, and second on the farm. Ellis threatened to cut off the purchaser of the opera house by a foreclosure, and French procured some friends to take Ellis' lien on the opera house, and deed the estate four houses and lots, which afterwards netted the estate $725. The homestead sold for $800. There was a mortgage given on a portion of this farm by Furze to the estate in 1888 for $1,900, and was found to be subject to a prior mortgage amounting to $417. Counsel figure that the Peach Lake farm cost the estate $11,525.16, and was worth but $5,000.

(b) Marden Mortgage. $300; 8 per cent.; given March 9, 1895. Nothing was collected upon this mortgage. It was a second mortgage, the first being afterwards bought by Gruner for $263.97. A loss of $398.50 is claimed. We are not advised whether any attempt was made to collect it. Gruner left the matter wholly to French.

(c) Hamilton Mortgage. $500. This was a third mortgage. The land was sold on foreclosure of the second mortgage, and the Ellis security was thereby lost. Gruner

held this mortgage from 1892 to 1897, and took no action, though informed in 1897 by letter that it was a third mortgage. The claim was lost.

| | |
|---|---|
| Principal | $500 00 |
| Interest | 98 76 |
| | $598 76 |

(d) The Goslin Mortgage. Given November 13, 1894, for $600, on house and lot and 40 acres of land. There was a prior mortgage on the land, and tax titles on the house and lot. Gruner bought these. Only $42 was realized on this property.

(e) Rentschler Mortgage. $350; 8 per cent.; dated December 15, 1896. French deeded the land covered by this mortgage, without consideration, to Rentschler, who gave a mortgage upon it, which French turned over to Gruner in lieu of money. After the failure of French, the estate was compelled to advance money to secure a good title to the land. The estate lost about $200 in the transaction.

It is a perplexing question to know what justice requires as to this class of securities. It was prudent to close out the copartnership matter, and it has been fortunate that it was done, as the consequences would have been serious had it continued. Even at that time French was deceiving his benefactors, as is shown by the transaction. The indemnity mortgage was surrendered at that time, but, while it may have provided security for the Ellis interests, its chief purpose appears to have been to indemnify him in copartnership matters. This transaction had the approval of Mrs. Ellis and H. P. Ellis, who was at that time old enough to be counseled with, though not of age. We think the claim upon the Peach Lake farm matter should be disallowed, except as to the loss upon the Furze mortgage. The Marden claim will also be disallowed, it appearing that this farm was traded for the Klacking farm. The other items, including the Furze farm mortgage, will be allowed, with simple interest upon the re-

spective loans at the legal rate, after deducting amounts paid.

### Fourth Class.

(*a*) Stevens Mortgage. The Stevens mortgage was given originally for $350. We do not readily find the date, owing to a mistake in the index, but it had increased over $200 on July 20, 1898. It was finally sold by H. P. Ellis for $450, and the testimony indicates that this is all that it was worth.

(*b*) Stanley Mortgage. The record shows a loss on this mortgage of $140.19. See statement of Babbitt on page 1425 of the record. It was on plains land.

(*c*) The John Hacht Mortgage. This was given September 12, 1887, for $2,000, and ran five years. Interest was allowed to accumulate as follows:

| | |
|---|---:|
| In 1888 | $9 00 |
| In 1889 | 189 00 |
| In 1891 | 234 00 |
| In 1892 | 368 00 |
| In 1893 | 368 44 |
| In 1894 | 428 44 |
| In 1895 | 688 00 |
| In 1896 | 742 00 |
| In 1897 | 882 00 |
| In 1898 | 1,022 00 |
| In 1899 | 1,171 39 |

Mr. Gruner admits that he had never seen this land until 1897 or 1898. This mortgage is still unpaid. Contestants claim a loss of $2,050.

The Peach Lake and Furze, Marden, Goslin, and Rentschler mortgages have been considered elsewhere.

Zimmer Mortgage. $500; 3 years; given November 17, 1896; 8 per cent. French owned a house and lot. Zimmer was his hired man, who, to accommodate French, accepted a deed, and gave a mortgage to French, who turned it over to the Ellis estate for money out of the estate, and then Zimmer deeded back to French. Security was inadequate, and resulted in a loss of $211.05.

The C. P. Walker Mortgage. $300; 7 per cent.; dated December 12, 1896. French had owned this land, and, after taking off the timber, had deeded it to Walker, without other consideration than this mortgage. French then let Gruner have it in place of moneys collected for the estate. It was upon plains land, which was worthless, and upon which Gruner had instructed not to loan any more money. The entire sum was lost, it is said.

L. F. Smith Mortgage. We have alluded to this mortgage in connection with the Darland mortgage, and we judge from the testimony of H. P. Ellis that it is covered there.

The Tranzo mortgage, given March 29, 1894, for $100, at 8 per cent., was upon poor land. Nothing has been realized upon it.

The James Beach mortgage was given for $450, on 40 acres of land, May 7, 1895. Gruner never saw it, and the proof shows that it was poor land. Taxes and interest were allowed to accumulate until the claim amounted to $566.32. It is claimed to have caused a loss of $300. Counsel do not state what has become of this mortgage.

Tawas Bank Stock. In 1895 French had been allowed to retain for two years or more $2,000 which he had collected for the estate. Gruner then took from French, for $1,000 of it, a demand note, taking as security some stock in a Tawas bank. This was lost, with the interest, amounting to $1,200. Gruner testified that he expected that it would be paid soon, but nothing was ever paid upon it, and it does not appear that he tried to collect it. The stock was or afterwards became worthless.

These items should be allowed, except the Peach Lake and Furze, Rentschler, Marden, and Goslin claims, which have been included and passed upon in another class, and the Stevens, Stanley, Zimmer, Tranzo, Beach, and Tawas Bank stock items, as we are not satisfied that the acceptance of these was negligent. The item of the Hacht mortgage should be allowed at $1,171.39, that being the amount of interest which had accumulated in 1899, with interest from that date.

### Fifth Class.

These items are based on failure to collect interest.

(*a*) Abbott Cottages. A mortgage of $1,200 was taken in 1887 upon these cottages. It drew 10 per cent. In 1898, Ellis found French in possession, and $634 back interest upon the mortgage. He took the properties from French, and sold them at an alleged loss of $219.71 to the estate. On redirect the witness stated that on those sold there was a loss of $135.33.

(*b*) The O'Clair mortgage was given March 30, 1885, for $300. It was permitted to run for 10 years without any payments or foreclosure. A loss of $175 is claimed.

(*c*) The Hayes Mortgage. Given for $300 March 16, 1886. No interest was paid after 1893. It was foreclosed in 1898, and bid in by French in his own name, without Gruner's knowledge. Gruner admits a loss of $110.85. Contestants claim $119.71. This might have been foreclosed earlier, but we are not satisfied that it would have resulted differently, owing to the condition of the market for lands. We think this should not be charged against the executor.

(*d*) The Tschirhart mortgage was given March 20, 1889, on 40 acres, for $140. It ran nine years without payment, and Gruner had forgotten that he had it until H. P. Ellis learned of it at West Branch. French sold this land to Kennedy upon a contract, receiving $25.

(*e*) Abbott Mortgage. Given July 18, 1887, on several cottages. Amount, $1,200. French obtained title early in the nineties, and collected the rent, and paid neither rent nor interest.

With the exception of the Hayes claim and Abbott cottages, these should be allowed, with simple interest at the legal rate from date of settlement. It is not made clear to us how contestants are entitled to rent of cottages when they are allowed for interest on the mortgage.

### Sixth Class.

This class consists of moneys collected by French and never accounted for.

McCrimmon Mortgage. The McCrimmon mortgage was compromised in 1898 by Ellis, in consequence of receipts held by him, for $68.39 loss to the estate.

Houston Mortgage. Given April 17, 1890; $550 at 8 per cent. Fifty-four dollars paid, not accounted for.

Ranger Mortgage. Given March 15, 1884; $300; 10 per cent. Thirty-two dollars was paid French, and not accounted for. Amount claimed, $35.20.

The Link mortgage has been referred to in connection with the Peaver mortgage. It was for $620. $29.70 interest was paid to French, and not accounted for. Amount claimed, $32.07.

Hiram Reed Mortgage. Given June 6, 1890; $155. H. P. Ellis found that this had been largely paid to French, and not accounted for. He adjusted the matter at a loss, which he states to have been $65.83.

The Rohl mortgage was given June 16, 1894, for $200, —a second mortgage. This was partly paid to French. Ellis settled at a loss of $86.01. Amount claimed, $92.89.

Jones Mortgage. Given November 4, 1892; $675, for five years, at 8 per cent. In 1898 Gruner reported amount $794.10. Taxes were back amounting to $24.81. French had made some collections. Ellis settled at a loss of $140.19. The claim is now for $156.99.

Maurer Mortgage. Claim, $373.86. It was adjudicated to have been paid to French, and was canceled.

The Jacob Meir mortgage was given to Joseph J. Ellis for $600. At his death $40.17 was due for interest, and it was so inventoried. The estate lost $65.67, according to Ellis' computation, through a failure of French to pay over collections made upon it by him.

Abbott Block Rents. It is claimed that the rent for this property was lost, to the amount of $126.40. We do not find proof warranting the allowance of this item. It was referred to in another class.

J. P. Benjamin Mortgage. This mortgage was settled in 1893. It is claimed to have been settled at a small loss. It does not appear why this was done, though counsel

undertook to explain it.    Counsel have not alluded to it in their brief.    This mortgage was taken by Ellis, and the loss is not satisfactorily explained.    It will be disallowed.

Freed Mortgage.    This is said to have been settled for $22.75 less than the amount due, and the loss is charged. We do not discover a denial or explanation.    It should be disallowed.

### Seventh Class.

The Ostrum mortgage was taken in 1884 by Ellis for $800, at 10 per cent.    Two years' interest was paid to Gruner.    Testator collected interest for the first year. Nothing was paid afterwards.    It was plains land, and Gruner testified that he found out before 1890 that it was not worth foreclosing.    He learned so from French.    It is claimed that it was collectible in 1890, but we are not convinced that this is so.    Contestants are asking pay for losses occasioned by taking mortgages upon plains lands, and at the same time claiming damages for a failure to collect a similar mortgage taken by the testator.    We think this claim should not be allowed to them.

### Eighth Class.

These claims are for taxes paid upon lands covered by securities all of which are alleged to be inadequate.    We think that few are valid claims.    The following should be allowed:

| | |
|---|---|
| Goslin house | $4 08 |
| Goslin farm | 11 55 |
| Goslin farm | 14 07 |
| McCrimmon | 12 20 |
| Rentschler | 4 60 |
| Smith | 11 26 |
| Total | $57 76 |

### Ninth Class.

The Thayer mortgage was received in payment of money collected by French.    In his bookkeeping he took credit for $150 as a disbursement, as though he had paid

that amount to French. This was an error, and we see no reason why the item should not be allowed to contestants.

### Tenth Class.

These claims are for interest on items omitted from Gruner's account,—one in 1889 and one in 1891. He had the money, and it is charged now to him in his account. Simple interest should be allowed upon them.

### Eleventh Class.

Amount paid Cheever. This is a technical claim, and should be disallowed.

H. P. Ellis went to Ogemaw county in 1898, and at that time obtained from French, for the estate, certain deeds of property upon which the estate held or previously had mortgages, which French had acquired title to; also deeds of other property to make up for defalcations. He also received from Gruner securities claimed to amount to upwards of $60,000, of the assets of the estate. It is important to ascertain whether any of these should be applied in reduction of the losses for which we have allowed contestants. So far as the $60,000 of securities are concerned, they were assets of the estate, for which the estate should have had a corresponding credit, if it did not, and ought not to be used to offset losses on other securities. We are not impressed by the claim that H. P. Ellis caused the failure of French. It is evident that it was time something was done to secure this estate, and that French must have failed whenever that should have been done. Ellis went to West Branch July 12, 1898. He took with him a list of securities obtained from Gruner. Cheever followed as soon as he learned of the failure. They secured some conveyances from French. Subsequently they secured a deed of what are called the "Stanley lands." They also obtained a deed of the French homestead.

The Stanley Lands. These lands were given upon a provision contained in the deed that they should settle the

Benjamin, Peaver, and Maurer mortgages. Ellis accepted the deed upon certain representations, which were untrue, and immediately tendered back a conveyance, which was not accepted. The estate never claimed these lands, and has no equitable claim upon them, in view of what passed.

We sustain the contestants' contention that the conveyances received were not in settlement of any claim against or liability of Gruner. They were taken by him, through his agents, as security for the protection of the estate.

Ellis found titles in French to premises upon which the estate had mortgages. Several of these have been mentioned. He induced French to deed these over, and manifestly the proceeds should apply on such securities, and surplus, if any, should apply on other debts of French. The properties thus transferred were:

1. Abbott cottages.
2. Green house.
3. Zimmer house.
(French testified that the mortgages on these equaled or exceeded the value of the property.)
4. Times Block.
5. Post-office property.
6. Tinlan farm.
7. Peach Lake farm.
8. Furze farm.
9. Hacht farm.
10. James Beach farm.
11. Rentschler farm.
12. Benjamin farm.
13. O. B. Stevens house.
14. Marden farm.
15. Stanley lands.
16. Boynton lands.
17. French homestead.

The Times Block claim was admittedly $3,301.96 in 1899. The testimony shows that it is worth no more. The estate had in the post office in 1899 $1,089.56. It was shown to be worth little, if any, more. The claim on the Tinlan farm in 1899 was $2,542.13. We think this was all that it was worth. We have already seen that losses

were sustained on the Peach Lake farm, Furze farm, Hacht farm, Beach farm, Rentschler farm, Benjamin farm, Stevens house, Marden farm, and Stanley lands. Of these the estate is allowed for its losses in the following: Furze farm, Hacht farm, Rentschler farm, and Benjamin farm. It would seem, therefore, that it should convey such of these as it owned at the time this hearing was had to the complainants.

The Boynton Lands. These lands were deeded to Gruner in trust, "to be used to pay any indebtedness by said Myron H. French to Gruner and to the estate of Ellis, the Ann Arbor Savings Bank, Mrs. Markham, and Jennie E. Cheever." Boynton and Morley deeded the same lands to Gruner, but not in trust. All of this was done at the instance of French, who assigned a land contract for them to Gruner. The latter was a warranty deed, and the former a quitclaim. Gruner afterwards deeded an undivided half to Cheever, without mention of a trust. French was indebted to all of the persons mentioned, and owed large sums to both Gruner and Cheever. We think complainants cannot now claim the benefit of these lands as an asset of the Ellis estate, but are entitled to any interest that such estate might otherwise have claimed.

The French homestead was taken in settlement of the Peach Lake farm and opera-house claims, and has been applied upon them.

The amount of these various items will be determined upon the settlement of the decree, if counsel cannot agree upon them, and the account will be surcharged therewith.

Where the term "legal interest" is used, it is intended to mean interest at the rate of 6 per cent.

Defendants will recover costs of both courts.

The other Justices concurred.