IN THE MATTER OF THE ESTATE OF OLIVER S. CARTER, DECEASED.

BANKERS TRUST COMPANY, TRUSTEE OF TRUST FOR CHILDREN OF LIZZIE COLEY BACOT, UNDER NINTH CLAUSE OF THE WILL OF OLIVER S. CARTER, DECEASED, PLAINTIFF-APPELLANT, v. JOHN V. BACOT, JR., JOHN CARTER BACOT, WENDY ANN ROSS, AND ANTHONY HORTON, DEFENDANTS-RESPONDENTS, AND ELEANOR B. DARRIN COULTER, BARBARA ANN BACOT ZECHES, DOROTHY DARRIN ROSS, JACQUELINE DARRIN HORTON, HOWARD A. DARRIN, JR., EDNA G. BACOT AND HAROLD K. COULTER, DEFENDANTS.

Aruged January 22, 1951—Decided February 26, 1951.

428

*Mr. Charles R. Hardin* argued the cause for the appellant (*Messrs. Pilney, Hardin & Ward,* attorneys).

*Mr. Robert W. Brady,* and *Mr. Francisco Pemberthy* of the New York Bar, argued the cause for the defendants-respondents (*Mr. Garrison Herr,* guardian *ad litem* for defendants-respondents, John Carter Bacot, Wendy Ann Ross and Anthony Horton, and *Mr. Edward C. Hillis,* attorney for defendant-respondent, John V. Bacot, Jr.).

The opinion of the court was delivered by
BURLING, J. This case involves an appeal by the plaintiff and cross-appeals by the defendants-respondents from a judg-

ment of the Essex County Court, Probate Division, entered on August 2, 1950, confirming the plaintiff trustee's second intermediate account, surcharging the trustee in the amount of $6,802.67 together with interest thereon in the sum of $4,857.84, and allowing counsel fees. The appeals are addressed to the Appellate Division of the Superior Court but have been certified by the Supreme Court on its own motion.

Oliver S. Carter died testate on June 28, 1901, a resident of New Jersey. His will which was dated July 20, 1900, and admitted to probate by the Surrogate of Essex County, New Jersey, designated The Mercantile Trust Company, a corporation of the State of New York and doing business in the City of New York, as trustee thereunder. The Mercantile Trust Company filed an account of its stewardship as trustee for the period ending August 30, 1907, which account was allowed by decree of the Essex County Orphans' Court on November 16, 1907. On August 10, 1911, The Mercantile Trust Company merged with the plaintiff, Bankers Trust Company, also a corporation of the State of New York, and the merged corporation continued its existence under the name of Bankers Trust Company.

On July 17, 1947, the plaintiff filed its second intermediate account with the Surrogate of Essex County, New Jersey, covering the period from August 30, 1907, to September 10, 1946. The guardian *ad litem* for the three infant remaindermen under the trust filed 26 exceptions to the account, and one of the two life tenants filed nine exceptions thereto. No exceptions were filed by the adult remaindermen or the other life tenant. On October 14, 1947, the accounting was referred by the Orphans' Court of Essex County to an advisory master whose conclusions were filed with the Essex County Court on May 26, 1950. Judgment was entered in the Essex County Court, Probate Division, on August 2, 1950, in accordance with the advisory master's conclusions in which ten of the exceptions of the guardian *ad litem* which included two of the exceptions of the life tenant, were allowed and the remaining exceptions were dismissed. The present appeals are from parts of the judgment so entered. The plaintiff has appealed from

the surcharge against it for omitting to take deficiency pro-·ceedings in respect to three mortgage investments, herein-.after referred to as investments Nos. 3, 5 and 10, and from the allowance of counsel fees to the defendants-respondents. The defendants-respondents have collectively appealed from the propriety of the dismissal of exceptions relating to the investments hereinafter referred to as investments Nos. 2, 3, 4, 5, 7, 8, 9, 10, 11 and 12 excepting to the extent that the ·exceptions were allowed with respect to investments Nos. 3, 5, 10 and 12. The defendants-respondents also appeal from the assessment against the trust estate of the counsel fee :allowed to the plaintiff.

The questions raised by the appeals are directed primarily to the nature of investments and their management by the trustee and the liability of the trustee for losses sustained by the trust on such investments. The investments under attack have been referred to by the court below by numbers, from 1 to 12, conforming to the first 12 exceptions of the guardian *ad litem*. The parties on appeal have followed the same manner of designation of the investments and the same method of reference is continued herein.

## I—The Applicable Law to the Investments Made By the Trustee.

The question of which law governs the investment ·of testamentary trust funds and the administration of trust ·estates, as distinguished from the validity and construction ·of the trust instrument, where elements of the trust, such ·as the testator's domicile, the trustee's domicile, the place ·of probate of the will, the *situs* of the trust property, the place where the trust is to be administered, etc., are not all located within the same state, is one which has resulted in some con-fusion, but the generally accepted rule to be extracted from the authorities is that a testamentary trust of personalty is to be administered by the trustee in accordance with the law ·of the state of the testator's domicile at the time of his death unless the will shows a manifest intention that the trust

should be administered according to the law of another state. See *In re Johnston,* 127 *N. J. Eq.* 576 (*Prerog.* 1940); affirmed, 129 *N. J. Eq.* 104 (*E. & A.* 1941); *Wilmington Trust Co. v. Wilmington Trust Co.,* 24 *A.* 2d 309, 139 *A. L. R.* 1117, 1126 (*Sup. Ct. Del.* 1942); 115 *A. L. R.* 802; *Restatement of the Law, Conflict of Laws,* 380, § 298; *Land, Trusts in the Conflict of Laws* (1940) 203 *et seq.,* §§ 36, 36.1, 36.2, 36.3, 40.1; *Goodrich, Conflict of Laws* (*3rd ed.* 1949) 490 *et seq.,* § 159. The testator's will in the instant case expressly authorized and empowered the trustee to invest in "safe income-bearing securities under the provisions of the statutes of New York regulating the investment of trust monies * * *." The will contained no other authorization of investments. Additionally, it is noted that the testator designated a New York bank as trustee, and it appears from *Macy v. Mercantile Trust Co.,* 68 *N. J. Eq.* 235 (*Ch.* 1904), in which the identical will was considered, that the testator himself had been "for a long time president of one of the leading banks" in New York. Under such circumstances we are in accord with the conclusions of the advisory master herein that the will empowered the trustee to invest in securities under the applicable New York statutes and that such statutes as construed by the courts of the State of New York are applicable to the investments made by the trustee and the administration of the trust estate. We are also in accord with the conclusion of the advisory master herein, that the trustee was empowered by the foregoing quoted provision of the will to invest in securities which were authorized by the New York statutes at the time of making such investment and was not limited to the making of investments in such securities as may have been authorized by the New York statutes in existence at the time the will was made or at the date of testator's death. Such latter conclusion is the only reasonable and practical construction to be placed on the quoted provision of the will. Such a conclusion was reached in *Reiner v. Fidelity Union Trust Co.,* 126 *N. J. Eq.* 78 (*Ch.* 1939), reversed on other grounds, 127 *N. J. Eq.* 377 (*E. & A.* 1940).

## II—Divided Loyalty.

The excepting defendants collectively contend that the plaintiff trustee should have been surcharged for losses sustained with respect to six specified mortgage investments and that the failure of the court below to so surcharge the plaintiff is error. The six investments involved in this category are referred to by the parties as investments Nos. 2, 7, 8, 10, 11 and 12. All of these investments, excepting No. 8, represented securities purchased by the plaintiff from Title Guarantee & Trust Company through its affiliate, Bond and Mortgage Guarantee Company, and were in the form of bonds and mortgages. Bond and Mortgage Guarantee Company guaranteed payment of the investments and Title Guarantee & Trust Company insured the title to the real estate embraced by the mortgages. Investment No. 8 represented participation in a larger mortgage purchased by the plaintiff through a corporate broker. The advisory master found as a part of his factual findings that the investments referred to as Nos. 2, 10, 11 and 12 were purchased by the trustee, acting through a mortgage investment committee of two persons, one of whom was a director of Title Guarantee & Trust Company and Bond and Mortgage Guarantee Company, and the other of whom had been formerly associated in official capacities with both the Title and Mortgage Companies; that investment No. 7 was purchased by the trustee, acting through a mortgage investment committee of three persons, the two persons above referred to and a third person who was also a director of the Bond and Mortgage Guarantee Company; that the maturity date of mortgage investment No. 2 was extended in 1928 by the trustee acting through a committee of two, one of whom was a director of the guarantor Bond and Mortgage Guarantee Company; that the extended maturity date of such mortgage together with the maturity date of mortgage investment No. 11 were extended by the trustee in 1931 and 1930, respectively, through a committee of three, two of whom were directors of the guarantor; and that the mortgage investment

No. 8 was purchased through a corporate broker by a committee of two, one of whom was a director of the corporate broker. It is observed that the, men who served on the trustee's mortgage committee in the transactions here involved were Macdonald, Downey and Belknap. Macdonald and Downey were directors of the plaintiff and Belknap was a vice-president but not a director of the plaintiff. Additionally, Macdonald and Downey were directors of Bond and Mortgage Guarantee Company, and Macdonald was also a director of Title Guarantee & Trust Company; Belknap was a director of Albert B. Ashforth, Inc., the corporate broker from which mortgage investment No. 8 was purchased. The advisory master concluded that there was no suggestion of actual disloyalty to the trust, that the interest of the trustee's mortgage investment committee in and control over the corporations from which it purchased the above designated securities was so unsubstantial as not to have affected the judgment of the trustee's said committee, and that the trustee should not be surcharged for the losses sustained by the trust on these investments. The advisory master's conclusion is based upon the premise that the members of the trustee's mortgage committee constituted a very small fraction of the directors of the corporation which sold the mortgage securities to the trustee and had no substantial financial interest in the corporations of which they were directors. We do not believe that the inquiry can be resolved solely upon the basis of the extent of the stockholdings of the trustee's mortgage committee personnel in the selling corporations, or the number of members on their board of directors. The vice of the present situation arises from the substantial representation of the selling corporations on the trustee's mortgage committee which in some instances was 50% of the committee and in others, 66 2/3%. The decisions to make mortgage investments of the trust funds were initially made by this committee. The influence of this committee in the ultimate choice of investments cannot be gainsaid. The power of the committee is reflected in the extension of mortgages by the trustee through the committee. Although there was no suggestion

that actual disloyalty existed in this case, the opportunity was present. In approving investments for the trustee the committee was in a position to permit the marketing by the selling corporations to the trustee of investments which may not have been so selective as a trustee should insist upon. Moreover, the committee was in a position where the business opportunities which were afforded to the personnel of the committee and the selling corporations by reason of the dual connections of these men could have been of far more importance to them than any financial benefits which would have come to these men as mere stockholders from the sales of securities to the trustee by the corporations of which they were directors. The trustee and the members of its committee through which it acted in investing the funds of the trust should have been in a position where they could act exclusively in the interest of the trust in pursuance of the duty imposed upon them by law to exercise the utmost fidelity to the trust. Manifestly the trustee's committee was not in such a position. As directors and trustees of the selling corporations they owed an obligation to such corporations to exert every effort to effect the sale of mortgage securities and, since the payment of the mortgages was guaranteed by the Bond and Mortgage Guarantee Company, to seek and obtain extensions thereof when desirable to the guarantor company. As representatives of the trustee it was their obligation to approve the purchase of only such mortgage securities, and to grant such extensions thereon, as would be for the sole benefit of the trust. The conflicting interests of these men is obvious.

The factual situation here presented is somewhat novel but the legal principle that undivided loyalty is of the very essence of a trust relationship and that a trustee may not place itself in a position where its interest is or may be in conflict with its duty is firmly entrenched in our jurisprudence and is nonetheless applicable and controlling. The high standard of conduct imposed upon a trustee by the New York courts is succinctly stated in *Meinhard v. Salmon,* 249 *N. Y.* 458, 164 *N. E.* 545, 546 (*Ct. of App.* 1928), wherein Mr. Chief Justice Cardozo said:

"* * * Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ti s. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. *Wendt v. Fischer*, 243 *N. Y.* 439, 444, 154 *N. E.* 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

See also *In re Ryan's Will*, 291 *N. Y.* 376, 52 *N. E.* 2d 909 (*Ct. of App.* 1943), and *In re Lewisohn*, 294 *N. Y.* 596, 63 *N. E.* 2d 589 (*Ct. of App.* 1945). The salutory principle is one of public policy and has been long recognized by the courts of this State. See *Staats v. Bergen*, 17 *N. J. Eq.* 554 (*E. & A.* 1867); *Shanley v. Fidelity Union Trust Co.*, 108 *N. J. Eq.* 564 (*Ch.* 1927); *Gates v. Plainfield Trust Co.*, 121 *N. J. Eq.* 460 (*Ch.* 1937); affirmed, 122 *N. J. Eq.* 366 (*E. & A.* 1937); *In re Bender*, 122 *N. J. Eq.* 192 (*Prerog.* 1937); affirmed, 123 *N. J. Eq.* 171 (*E. & A.* 1937); *Rothenberg v. Franklin Washington Trust Co.*, 127 *N. J. Eq.* 406 (*Ch.* 1940); affirmed, 133 *N. J. Eq.* 261 (*E. & A.* 1943); *Taylor v. Errion*, 137 *N. J. Eq.* 221 (*Ch.* 1945); affirmed, 140 *N. J. Eq.* 495 (*E. & A.* 1947); *Liberty Title and Trust Company v. Plews*, 6 *N. J.* 28 (1950). The rule has been recognized by the United States Supreme Court. *Magruder v. Drury*, 235 *U. S.* 106, 59 *L. Ed.* 151 (1914). In *Camden Trust Co. v. Cramer*, 136 *N. J. Eq.* 261, 266 (*E. & A.* 1944), Justice Heher stated the rule as follows:

"* * * It is both sound law and good morals that a fiduciary may not, in case of conflict, subordinate the *cestui's* interest to his own. Undivided loyalty is of the very essence of the relationship. The trustee is under a peremptory duty of complete loyalty and fidelity to the *cestui*. Self-interest can never be the determinative. He cannot serve two masters in an area of service involving divergent and discrepant interests."

▆▆ In the present case mortgage investments Nos. 2 and 11 were extended by the trustee acting through its committee,

as earlier noted, and one of the committee members while a director of the selling corporation appraised two of the mortgage investments (Nos. 11 and 12) for the trustee. With respect to the appraisals the advisory master noted that "It is true that the *cestui que trust* does not in such case have the same safeguard which he would have had if an 'outside' appraisal had been obtained; the director whose actions are assailed could more easily have palmed off upon the trust a poor investment," but concluded that the "possibility that the director was subjected to a greater temptation to act against the interests of the trust merely because he made the appraisal is remote and insufficient to lay upon the corporate trustee the heavy burden of absolute liability." But the philosophy underlying the rule is not premised on comparatives or measured by degrees. The rule is referred to in the cases as "inexorable" and one of "uncompromising rigidity" and does not permit of any division of loyalty. Complete loyalty to the trust does not mean almost complete loyalty nor does undivided loyalty permit *slightly* divided loyalty. Any whittling away of the established rule or the philosophy supporting it would result in the "disintegrating erosion" against which admonition was given by Mr. Chief Justice Cardozo in the case of *Meinhard v. Salmon, supra.*

The only manner in which the application of the stringent rule which imposes absolute liability upon a trustee for a violation of its duty of undivided loyalty may be avoided is where the *cesluis que trust* have been fully informed of the details of the transaction and have concurred or acquiesced therein. That is not the present case.

It is our conclusion that since at least one-half and in some cases two-thirds of the trustee's mortgage committee were in a position of conflicting interests, the trustee is liable for losses sustained in this category of transactions although there is no showing of actual disloyalty. It is necessary that every possible temptation be removed from the trustee.

### III—DEFICIENCY JUDGMENTS.

The judgment below surcharged the trustee for alleged neglect in failing to institute deficiency proceedings against the obligors on the mortgage bonds in connection with investments Nos. 3, 5 and 10. The trustee has appealed from so much of the judgment as imposes these surcharges. The factual situation with respect to these three mortgages appears to be that the investments were made between 1927 and 1930. Title to the mortgaged premises was acquired by the trustee between March 22, 1935, and October 6, 1936, by deeds in lieu of foreclosure with respect to investments Nos. 3 and 5, and by foreclosure with respect to investment No. 10. The three properties were subsequently sold at a loss and no steps were taken by the trustee to collect the deficiencies. The trustee sought to justify its failure to institute deficiency proceedings by urging that under the law prevailing in New York during the period of acquisition of the mortgaged premises it was under no duty to institute deficiency proceedings. In 1933 emergency mortgage laws were enacted in New York State for the benefit of mortgagors, which provided a new procedure for obtaining deficiency judgments and which limited the amount of recovery thereof to that part of the deficiency which exceeded the fair and reasonable market value of the mortgaged premises "as of the date such premises were bid in at auction or such nearest earlier date as there shall have been any market value thereof * * *." *Sec.* 1083-a, *Civil Practice Act*. There was testimony that the trial court referees in New York during the period here involved and prior to November 24, 1936, considered that because of the existing depression there was no existing market for real estate and consequently looked to "such nearest earlier date as there shall have been any market value," which was usually considered to be 1928, 1929 or 1930, as a result of which it was practically impossible to obtain deficiency judgments because the market value of the earlier years was usually greater than the amount of the deficiency. That this was the prevailing practice of the trial courts in New York until

November 24, 1936, finds support in *Heiman v. Bishop*, 272 N. Y. 84, 4 N. E. 2d 944 (*Ct. of App. Nov.* 24, 1936), which appears to have been a test case. In that case the foreclosure sale took place on June 16, 1935, and the trial referee determined that the nearest date when there was a market value was 1930, at which time the market value was greater than the amount due under the mortgage, and accordingly denied the motion for a deficiency judgment. This judgment was unanimously affirmed by the Appellate Division. *Heiman v. Bishop*, 248 App. Div. 561, 288 N. Y. S. 1058 (*May* 8, 1936). The Court of Appeals, however, on November 24, 1936, reversed the judgment and determined that the emergency legislation was designed to set up a new standard for determining value, saying, "otherwise the section would have the effect of depriving mortgagees of deficiency judgments in practically all cases." The Court of Appeals delineated eight factors which should be considered in a determination of the market value of mortgaged premises; one of the factors so enumerated was "assessed value." The advisory master herein, relying partly upon the Court of Appeals decision in the *Heiman* case accepted as market value of investments Nos. 5 and 10 the tax assessed value, and as market value of investment No. 3 an appraisal made at the time of the trustee's acquisition of title to the mortgaged premises in 1936, and surcharged the trustee for the losses sustained on these three investments on the theory that the trustee should have endeavored to obtain deficiency judgments. Reliance was also placed on *Beekman v. Ross*, 274 App. Div. 292, 83 N. Y. S. 2d 326 (1948), for the proposition that assessed value is presumptive evidence of value. We are not in accord with the conclusion and judgment pursuant thereto on this point.

The force of the *Beekman* case in its application to the question here involved is somewhat diminished when it is considered that that case did not involve a deficiency proceeding and the court decided that assessed value could be considered as presumptive evidence in fixing the value of property but that such evidence was not conclusive but "should be considered with other appropriate evidence relating to value."

 The decision of the Court of Appeals in *Heiman v. Bishop, supra,* stated the New York law with respect to the fixing of market value in deficiency proceedings. The contrary decisions of the lower courts in New York resulted from a misinterpretation of the statute. The question, however, is whether the trustee should be surcharged for an exercise of judgment prior to the correct interpretation of the statute by the Court of Appeals. Title to the three properties under discussion was acquired by the trustee prior to the Court of Appeals decision in the *Heiman* case. In each case the appraised value of the mortgaged real estate involved was in excess of the mortgage debt when measured by market value of the earlier years. The real estate covered by mortgage No. 3 was appraised at $17,500 in 1930 and the amount of indebtedness due on the mortgage at the time title to the premises was acquired was $10,516.52. The 1930 appraisal of the premises embraced by mortgage No. 5 was $68,000 and the amount of the debt when title was acquired by the trustee was $39,618.71. The relative figures with respect to mortgage No. 10 are a 1928 appraisal of $250,000 against a debt of $164,608.33 at the time of the acquisition of title. A trustee, under New York law, is bound to employ such prudence and care in the management of the trust estate as, in general, prudent men of discretion and intelligence in such matters employ in their own like affairs. *In re Clark's Will,* 257 *N. Y.* 132, 177 *N. E.* 397 (*Ct. of App.* 1931). Whether the trustee has acted prudently depends upon the circumstances as they reasonably appeared to it at the time it acted and not as they may appear at some subsequent time. *In re Clark's Will, supra; Restatement of the Law, Trusts,* § 174, *comment b,* 449. What should a prudent trustee have done under the circumstances which existed here? Should it have assumed that the lower courts had misinterpreted the deficiency proceedings statute and expended the trust funds to pioneer with a test case? Should it have endeavored to obtain deficiency judgments in the courts of original jurisdiction in view of the existing facts? This would have entailed some depletion of the trust estate for expense incident thereto. Or was it

justified in concluding that under the circumstances the trust estate would be better served by refraining from the expenditure of trust funds in what was thought to be a futile venture? Suppose the trustee had expended the trust funds in an effort to obtain deficiency judgments and it had been ultimately determined that the lower courts' interpretation of the statute was correct. In such posture should the trustee be surcharged for the expense incurred by the trust in such litigation on the premise that it had failed to exercise the proper judgment? The difficulty of decision of a trustee in such a situation is apparent. To hold a trustee liable for failure to make the proper decision under such circumstances appears to place too heavy a burden upon it. It is our opinion that the surcharge imposed upon the trustee under this point was error.

The guardian *ad litem* appeals from the refusal of the court below to surcharge the trustee for a loss sustained on investment No. 11. This involved a mortgage which was foreclosed in 1944-1945, subsequent to the decision by the Court of Appeals in the *Heiman* case, *supra*. No effort was made by the trustee to obtain a deficiency judgment. The advisory master concluded that the mortgage debt was approximately $15,000 and that since the assessed value was $15,000 the trustee would probably have been unable to obtain a deficiency judgment since the emergency limitations on obtaining such judgments were still in effect. But here again it would seem too much emphasis is placed on assessed value which under the *Heiman* case was only one of the factors to be considered in determining market value. It appears that appraisers employed by the trustee appraised the mortgaged property here involved at $5,000 in 1945, shortly prior to the completion of the foreclosure. Under such circumstances and since the Court of Appeals had clarified the emergency legislation with respect to the factors to be considered in fixing market value approximately nine years prior to the foreclosure of the mortgage under discussion, it occurs to us that the trustee was under a duty to endeavor to obtain a deficiency judgment. Its failure to so proceed should result in a surcharge.

An additional point raised by the guardian *ad litem* in this connection relates to mortgage investments Nos. 4 and 8. It appears that deficiency judgments were obtained by the trustee after foreclosure of these two mortgages but that no evidence was adduced reflecting that any efforts had been made by the trustee to collect said judgments. It appears that the fact that judgments had actually been obtained by the trustee in these two cases was not made clear to the advisory master. Since the trustee has conceded that the burden was upon it to establish its inability to collect deficiency judgments, and since no evidence appears which would excuse its failure to collect on these two judgments which were entered in 1933, it follows that the trustee should be surcharged for the losses sustained through its dereliction.

### IV—ENCUMBRANCES.

It is urged by the exceptants that seven of the mortgage investments (Nos. 3, 5, 7, 8, 9, 10 and 11) were illegal because the real estate embraced by the mortgages was encumbered by various easements and use restrictions. The pertinent New York statutory authority requires that investments in bonds and mortgages be on unencumbered real property. *Decedent Estate Law,* § 111, *L.* 1922, *c.* 593; *L.* 1925, *c.* 604; *L.* 1926, *c.* 307; *L.* 1928, *c.* 362; *McKinney's Consolidated Laws, c.* 13. The advisory master relied upon *dicta* in two New York cases, *Matter of Poillon,* 298 *N. Y. S.* 220 (*Sur. Ct.* 1937), and *Matter of Adriance,* 260 *N. Y. S.* 173 (*Sur. Ct.* 1932), for the proposition that where a trustee takes a mortgage on encumbered property he will not be held liable for a loss thereon unless the loss is attributable to the encumbrances. There appears to be no suggestion that the various encumbrances contributed in any manner to the losses sustained on these investments. Moreover, it appears that in all of the mortgage investments here involved, excepting Nos. 5 and 8, the trustee had no notice of the alleged encumbrances and relied on the assurances of title companies that the mortgages were first liens and that the title was marketable. With re-

spect to investment No. 5 the trustee had notice of an ease-ment and restrictions but also had a title policy stating that the mortgage was "a first lien on a good and marketable title." With respect to investment No. 8 the title policy disclosed "restrictive covenants." These restrictions forbade the use of buildings for "brewery, distilling, slaughter house, smith-shops * * * or for any other dangerous, noxious or offen-sive purposes * * *." The mortgaged premises (No. 8) were situated in a neighborhood where stores and apartments were located and it is not perceived how the restrictions could in any manner be considered an impairment of the mortgage investment. Additionally, the mortgages, excepting No. 8, were guaranteed. We find no error in the judgment below in connection with this item.

### V—Slowly Depreciating Securities.

It is contended that mortgage investments Nos. 9 and 11 should have been foreclosed in 1933, when they matured, since there was a declining market, and that failure of the trustee to foreclose until 1940 and 1944 respectively should result in surcharge for the losses sustained. Hindsight cannot be used to create liability. The trustee should not be charge-able with knowledge in 1933 that the value of real estate was going to further decline. The trustee at that time might well have considered that the market had reached bottom and that an upturn would commence. Further it appears that the trustee was continuing to collect payments on account of the mortgage principal and interest during the respective periods the mortgages were held prior to ultimate foreclosure. We agree with the judgment below that there is no basis for sur-charge under this point.

### VI—Legality of Certain Investments.

The guardian *ad litem* contends that investments Nos. 2, 3, 7, 10 and 11 were not investments in bonds and mortgages within the purview of the New York statutory

authority permitting investments by trustees in bonds and mortgages, since the enforcement of the mortgages was delegated to the companies guaranteeing payment of the mortgages. The form of guarantee which accompanied the sale of the mortgages to the trustee constituted the guarantor irrevocably the exclusive agent of the assured trustee to collect the interest on the bond and mortgage and to exercise every option or privilege given by said bond and mortgage to the mortgagee. The guarantor, however, was given no authority to extend the maturity of the mortgage. It is true that the trustee did not have the same control over the bonds and mortgages as it would have had without the existence of the guarantor in the picture, but it is also true that without the guarantor the trustee would not have had any guarantee of payment of the mortgage. No citation of authority is presented in which such investments have been held to be illegal investments for trust funds in New York. The advisory master found as a fact that investments of this type were quite widespread in the State of New York during the years under consideration. Forms of guarantee similar to those used here were referred to without criticism in *Matter of Harnden,* 64 *N. Y. S.* 2d 180 (*Sur. Ct.* 1946) ; affirmed, 271 *App. Div.* 979, 68 *N. Y. S.* 2d 798 (1947) ; leave to appeal denied, 296 *N. Y.* 1058, 73 *N. E.* 2d 120 (1947), and *Matter of Allen,* 142 *N. Y. Misc.* 113, 254 *N. Y. S.* 176 (*Sup. Ct.* 1931). We see no reason to disturb the judgment below on this point.

## VII—Purchase Money Mortgages Held By the Trustee.

The guardian *ad litem* contends that purchase money mortgages held by the trust on the accounting date resulting from the sale of the mortgaged properties covered by mortgage investments Nos. 2, 3 and 11 should be replaced by the trustee with cash. But the trustee is being granted allowance for the loss incurred on investment No. 3, and since the trustee is being surcharged for the losses incurred on investments Nos. 2 and 11, and the present purchase money mortgages are being

carried in the trust at their present fair value, we see no reason why the trustee should be so penalized.

VIII—NEGLIGENCE WITH RESPECT TO INVESTMENT No. 7.

The exceptants contend that the loss sustained on this mortgage investment resulted from gross negligence on the part of the trustee in its purchase and management of the investment. Since we have determined under II—DIVIDED LOYALTY herein, that the trustee is liable for surcharge for the loss sustained on this investment, further discussion of this investment is unnecessary.

## IX—COUNSEL FEES.

Arguments of the several parties to this appeal with respect to the allowance of counsel fees and their assessment against the trust estate by the court below are without merit. The contention of the trustee that the allowances to counsel for the exceptants assessed against the trust estate are excessive in view of the amount of the surcharge is now dispelled by our conclusions with respect to the items of surcharge. Further, the work of counsel in this litigation has been both intensive and extensive and the amount of the surcharge is only one item to be considered in the fixing of appropriate counsel fees. Likewise, the assessment of the counsel fees allowed to counsel for the trustee against the trust estate is justified since the surcharges against the trustee do not result from actual fraud or active misconduct.

The judgment of the County Court is modified as herein stated and the cause is remanded to the County Court for a redetermination of the amount of surcharge in accordance with this opinion. Since neither side has completely prevailed, no costs are allowed on this appeal.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and ACKERSON—5.