25 N.J. 467 (1957)
136 A.2d 875
IN THE MATTER OF JOHN MILD, DECEASED.
CATHERINE DORN, SUBSTITUTED ADMINISTRATRIX OF THE ESTATE OF JOHN MILD, DECEASED, AND HARTFORD ACCIDENT AND INDEMNITY COMPANY, ACCOUNTANTS-APPELLANTS,
v.
KATALIN SCHEUER, ET AL., EXCEPTANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued October 28, 1957.
Decided December 16, 1957.
*471 Mr. Samuel A. Larner argued the cause for the appellants (Mr. Mervin Herzfeld and Messrs. Budd, Larner & Kent, attorneys).
Mr. Morton Stavis argued the cause for the respondents (Messrs. Gross, Blumberg, Goldberger & Stavis, attorneys).
The opinion of the court was delivered by PROCTOR, J.
This is an appeal by Catherine Dorn, substituted administratrix of the estate of John Mild, and the Hartford Accident and Indemnity Company, her surety, from a judgment of the Bergen County Court sustaining objections to her final accounting and surcharging her for the sum of $32,164.70, which was embezzled from the estate by her attorney, Charles Halstead. The case was certified by this court on its own motion before consideration by the Appellate Division.
John Mild died intestate in Bergen County on August 11, 1950, leaving an estate of approximately $40,000. Upon the application of a creditor of the decedent, the Bergen County Court on September 22, 1950 appointed the United States Trust Company of Paterson and George Winne, Esq., as co-administrators of the estate. Shortly thereafter the co-administrators learned that Charles Halstead, an attorney who had represented the decedent during his lifetime, was in possession of some of the decedent's assets, and on October 5, 1950 they informed their attorney of this fact and suggested that a full investigation into Halstead's activities be instituted. On October 6, 1950 the attorney wrote to Halstead and requested that he turn over any of the decedent's assets in his possession to the co-administrators. On October 25, 1950 Halstead delivered a writing to the attorney which acknowledged that he was holding estate assets worth $4,325, consisting of a mortgage executed by Alexander Thompson and his wife to decedent in the amount of $1,700; cash in the amount of $2,500 which had been deposited with Halstead by the decedent, prior to his death, to be invested in a mortgage; and cash in the amount of $125 representing *472 interest on a mortgage from Anthony Varcadipane and his wife to the decedent. Halstead refused to turn these assets over to the co-administrators who, consequently, filed a motion with the Bergen County Court returnable on December 4, 1950 for an order directing him to surrender the estate assets in his possession.
Halstead's reaction was immediate and direct. He conceived an ingenious scheme designed to forestall any judicial inquiry into his activities by filing a cross-motion returnable on the same day for an order substituting Catherine Dorn, a niece of the decedent, for the co-administrators. Halstead had located Mrs. Dorn through a cousin of the decedent and told her that since she was the nearest relative she, rather than the co-administrators, should administer Mild's estate. Mrs. Dorn was a foreign born woman over 60 years of age, who was employed as a domestic in New York City. She could read and write very little English and had practically no business experience. She had no reason to suspect Halstead, who had been a reputable member of the New Jersey bar for 16 years, and who had represented the decedent during his lifetime. It is entirely clear that she acted in good faith in consenting to act as administratrix and in retaining Halstead to represent her in that capacity.
Upon the return date of the above-mentioned motions the court issued an order dated December 20, 1950, which directed that the co-administrators show cause on January 25, 1951 why Mrs. Dorn should not be appointed substituted administratrix. The court also ordered that the co-administrators' motion directing Halstead to turn over the estate assets be deferred until January 25, 1951, and further ordered that the co-administrators be restrained from proceeding with the administration. The return date was later adjourned until April 13, 1951.
However, despite Halstead's success in obtaining the restraining order, the co-administrators continued to investigate the extent of Halstead's control over the estate assets, and on December 27, 1950 they uncovered evidence of the possible misappropriation by Halstead of other estate assets. *473 They discovered that Anthony Varcadipane and his wife had in February 1950 executed a mortgage to the decedent to secure a loan of $5,000 and that this mortgage was still open of record. But in answer to an inquiry made by an officer of the United States Trust Company the Varcadipanes stated that they had paid this mortgage in full by making payments directly to Halstead during the decedent's lifetime. On January 19, 1951 the attorney for the co-administrators wrote to Halstead and demanded an explanation of the highly suspicious circumstances concerning the Varcadipane mortgage and stated that the co-administrators felt "duty bound" to clarify this situation. A copy of this letter was sent to the judge who had issued the restraining order and order to show cause. It appears from the record that after these letters were dispatched the co-administrators apparently abandoned their efforts to expose Halstead as a possible embezzler and instead adopted a completely passive role in an apparent effort to effect a safe and painless withdrawal from any further involvement in the administration of the estate. Consequently, on April 13, 1951 the co-administrators seemingly abandoned their pending motion to compel Halstead to turn over the assets in his possession and tendered their resignation to the judge who had issued the order to show cause. In response to their offer, on May 3, 1951 the court issued an order which not only made no mention of the motion pending against Halstead, but also provided that the co-administrators would be discharged upon their submitting a formal or informal account to Mrs. Dorn and upon the delivery of any of the estate assets "as they may now have" to her. The order also provided that Mrs. Dorn be appointed substituted administratrix upon the giving of a bond with approved sureties in the sum of $40,000.
It should be observed at this point that in view of the court's knowledge of Halstead's activities it was, to say the least, quite peculiar that the court's order provided for an informal accounting. But when one refers to N.J.S. 3A:6-58, which provides:
*474 "A fiduciary removed or discharged by any court shall, within 60 days after removal or discharge or within such shorter or longer period as the court may direct, state and settle his account before the superior court or county court, as the case may be, for all the assets of the estate in his charge."
it is apparent that the court did not have discretion to permit an informal accounting in this situation and that the order was not only contrary to the provisions of the statute but also against the dictates of common sense in this type of situation.
It appears from the record that neither the court nor the co-administrators attempted to inform Mrs. Dorn of the facts concerning Halstead's suspicious activities at this time. Therefore, without any inkling of the gathering clouds of suspicion which surrounded Halstead's handling of the decedent's assets, on June 5, 1951 Mrs. Dorn obtained a surety bond in the amount of $40,000 and undertook the administration of the estate. However, the co-administrators retained possession of the assets which they held until October 2, 1951, when Mrs. Dorn approved their informal account. This account did list on its face the aggregate value of the estate assets as $40,609.08. However, it appears that this account was not designed to inform Mrs. Dorn of the true nature or location of the assets listed. For example, despite their knowledge of the alleged payment in full to Halstead of the Varcadipane mortgage, the account merely listed it as a mortgage open of record without any disclosure of the facts that their investigation had revealed. The last items in this account were set forth as follows:

"SUNDRIES:
 Other Assets ........................... 4,325.00
 Accrued Interest Joseph Federico
 et als.
 Bond and Mortgage ................. 116.87
 Accrued Interest Nancy Varcadipane
 and Anthony Varcadipane
 Bond and Mortgage ................. 113.89 4,555.76
 ________ ___________
 TOTAL PRINCIPAL ASSETS ..................... $40,609.08"
 ___________

*475 Thus, under the heading "SUNDRIES: Other Assets ... 4,325," the co-administrators purported to account to their successor fiduciary for $2,625 in cash and the $1,700 Thompson mortgage which they knew were in Halstead's possession, as evidenced by his receipt of October 25, 1950, and which they had failed to recover from him despite their initial effort in that direction.
At the same time Mrs. Dorn approved the "informal account" she also signed a document acknowledging the receipt by her of all the estate assets listed therein. This statement listed the Varcadipane bond and mortgage as an asset, without mention of the fact the mortgagors had asserted that it had been discharged by payment in full to Halstead. This statement of assets did not include the $4,325 listed in the informal account. Although Mrs. Dorn acknowledged receipt of these assets, she did not actually obtain physical possession of them. Instead, the co-administrators turned them over directly to Halstead and received a release executed by Mrs. Dorn which purported to relieve them from all liability in the estate of John Mild.
It is readily perceivable at this point that by a series of clever maneuvers Halstead was successful in forestalling any investigation into his activities by securing the substitution of an innocent pawn as administratrix without any opposition from the prior administrators, who, as a result, were ostensibly relieved from all liability to the estate and Halstead remained in complete control of the estate assets.
From the moment Mrs. Dorn undertook her duties as administratrix, until Halstead disappeared in 1954, she relied entirely on his advice and direction in the administration of the estate. She made no attempt to marshal the assets of the estate and entrusted all responsibility to him. With the exception of occasionally calling Halstead on the telephone over the years and occasionally meeting him on the street in New York City to sign papers, she did nothing to supervise the administration. She signed any documents Halstead put in front of her, without reading them or questioning *476 the reason for their execution. Bank accounts were opened in her name on behalf of the estate, but she did not even know in what banks such accounts were opened and she never saw the bank statements or the bank books. She signed blank forms for Halstead and even affixed her signature to a blank transfer inheritance tax form. She also endorsed government bonds for Halstead so that they might be redeemed. Two Treasury checks as payments for the bonds were issued to her and endorsed by her to Halstead who cashed them. The estate never received any of the proceeds. At the trial below Mrs. Dorn denied endorsing these checks, which totalled $18,827.50, and in support of her denial testified that she had filed a claim against the Federal Government alleging that her signature had been forged by Halstead. However, the government rejected her claim and at the trial there was unequivocal testimony by a handwriting expert that Mrs. Dorn's signatures were genuine. This testimony was not controverted.
Halstead absconded in June 1954 with over $32,000 of the estate's funds and more than $100,000 of other clients' funds, and although many indictments have been found against him they have never been tried because he has never been located.
Mrs. Dorn immediately retained another attorney who, upon ascertaining the extent of Halstead's peculations, filed an intermediate account with the surrogate in Bergen County on March 2, 1955. This account disclosed the assets embezzled by Halstead. No exceptions were filed and a judgment settling the account was entered on May 23, 1955.
In February 1956 Mrs. Dorn filed a final account in which she charged herself with a balance brought forward from the intermediate account of $34,829.32 and then prayed for an allowance of the sum converted by Halstead. Exceptions to the allowance of this sum were filed by five nephews and nieces of the decedent, who asserted that this loss was due to the negligence of Mrs. Dorn. The trial court found that Mrs. Dorn was negligent in the administration of the estate and surcharged her for the full amount converted by Halstead. *477 On application of her counsel, the trial court agreed to hear additional testimony on the issue of Mrs. Dorn's liability for any embezzlements which were committed before she was appointed administratrix. After the rehearing, the trial court affirmed the surcharge for all of Halstead's embezzlements, including those which were committed before her appointment.
On this appeal appellants contend (1) that the judgment approving the intermediate account is res adjudicata and bars the exceptants from relief; (2) that the court erred in surcharging the administratrix for the estate assets embezzled by her attorney; (3) that the proofs fail to establish that the alleged negligence of the administratrix was the proximate cause of the losses sustained by the estate and (4) that the administratrix should not be surcharged for the amount of any peculations which were committed prior to her appointment.
The appellants assert that since the complaint filed in the intermediate account fully disclosed the peculations by Halstead and since that account was allowed by the court, without any exceptions being raised, N.J.S. 3A:9-8 bars the exceptions to the final account and renders the judgment allowing the intermediate account res adjudicata on the issue of the appellants' liability for such peculations. N.J.S. 3A:9-8 provides in part:
"b. A judgment allowing, after due notice, an account other than a guardian's intermediate account, shall be res adjudicata as to all exceptions which could or might have been taken to the account, and shall constitute an approval of the correctness and propriety of the account, the legality and propriety of such investments and other assets, the legality and propriety of such changes in investments or other assets, and the legality and propriety of such other matters, and also shall exonerate and discharge the fiduciary from all claims of all interested parties and of those in privity with or represented by such interested parties, * * *."
However, the above statute indicates that in order for a judgment to be res adjudicata as to any future exceptions the judgment must in fact allow the account as prayed for *478 by the accountant. It is axiomatic that that which is to be allowed must be prayed for.
The intermediate account states:

"AS TO CORPUS
 THE ACCOUNTANT CHARGES HERSELF AS FOLLOWS:
 Balance as per last account allowed by
 order of the Bergen County Court, Probate
 Division ........................................... $40,609.08
 Amount received during the period
 covered by this account ............................ 3,982.87
 __________
 TOTAL .................................... $44,591.95
 THE ACCOUNTANT PRAYS ALLOWANCE AS FOLLOWS:
 Amount prayed allowance for as appears
 in the account ..................................... 8,741.31
 Balance corpus remaining in the hands of
 the accountant consisting of the assets
 shown in Exhibit `A' ............................... 35,558.90
 Cannot be explained ................................ 291.74
 ___________
 TOTAL ...................................... $44,591.95"

It appears from the above that Mrs. Dorn specifically prayed for an allowance of $8,741.31. But the account stated that there was a balance remaining in her hands of $35,558.90 which included the sum embezzled by Halstead. It appears from the account that she did not specifically pray for an allowance of the sum embezzled. Therefore, there was no reason for the present exceptants to object to the allowance of this account. Moreover, an examination of the judgment approving this account and the information upon which it was based discloses that it did not purport to grant an allowance for the defalcations of Halstead. The judgment was predicated upon a summary report of the account by the surrogate, which read as follows:

*479 "To the Judge of the County Court of Bergen County, Probate Division
The above account having been placed on the files of my office on the 3rd day of March A.D., 1955, and being by me audited and stated, is now reported for settlement.
 Dated: April 25, 1955.
 DONALD G. DUTCHER
 Surrogate.

 Amount brought forward ....................... $9,033.05
 By Court's, Clerk's, Surrogate's and
 Advertising fees, on auditing and
 stating account, allowance, copy
 recording, etc. ................................. 71.00
 (Waived)
 Allowance by Court to Accountant for
 Counsel fees to Mervin Herzfeld, Esq. ........... 1,000.00
 Balance in accountant's hands ................ 34,829.32
 ____________
 $44,933.37."

The judgment settling the account stated "The said account be in all things allowed as reported." Therefore, it appears that neither the surrogate nor the court intended to grant any allowance except the $9,033.05 reported in this summary. The summary clearly indicated that there remained a balance in the hands of the accountant of $34,829.32, which included the sum stolen by Halstead. Thus, the words of the judgment settling the account which stated that the account "be in all things allowed as reported" referred to the report by the surrogate and cannot be construed as granting any allowance for Halstead's peculations.
The fact that Mrs. Dorn in her final account charged herself with a balance of $34,829.32 "as per last account allowed by order of the Bergen County Court * * *," shows that Mrs. Dorn did not interpret the judgment settling the intermediate account as allowing the sum which was stolen by Halstead. Further evidence of Mrs. Dorn's understanding of the effect of this judgment appears from the fact that in her final account she specifically prayed for the allowance of "Amount allegedly converted by Charles Halstead *480 as appears in Exhibit `A' ... $32,164.70." Certainly if Mrs. Dorn believed that the judgment had allowed this item she would not have felt compelled to pray for the same allowance again in the final account. There is no merit to the appellants' argument that the judgment allowing the intermediate account was a bar to the exceptions raised in the final account. Under N.J.S. 3A:9-8 a mere disclosure of a loss of estate assets in an intermediate account, without praying for and obtaining a judgment relieving the accountant from liability for such loss, does not make the judgment approving such an account res adjudicata as to any exceptions made to a later account in which the accountant seeks to be relieved from liability for such loss.
The appellants also assert that the substituted administratrix was not negligent in relying upon the advice of an apparently honest and competent attorney or in permitting him to freely conduct all the details of the administration of the estate. In support of this contention they point out that Mrs. Dorn was an uneducated person, with little comprehension of the duties of an administratrix, and, in the light of her limitations, it was entirely reasonable for her to entrust the administration of the estate to a reputable member of the bar.
The duty of a fiduciary is to "exercise that degree of care, prudence, circumspection and foresight that an ordinary prudent person would employ in like matters of his own." In re Koretzky's Estate, 8 N.J. 506, 524 (1951).
This standard does not admit of variation to take into account the differing degrees of education or intellect possessed by a fiduciary. The standard of the "ordinary prudent person" is of necessity an ideal one and is not tailored to the imperfections of any particular person. Mr. Justice Holmes aptly stated the rule as follows:
"The standards of the law are standards of general application. The law takes no account of the infinite varieties of temperament, intellect and education which make the internal character of an act so different in different men. It does not attempt to see men as God sees them, for more than one sufficient reason * * *." Holmes, The Common Law, p. 108 (1881).
*481 Mrs. Dorn's conduct must be measured by the standard of the mythical ordinary prudent administratrix, notwithstanding her natural limitations.
It is not asserted that Mrs. Dorn was negligent in the selection of Halstead as her attorney. Nor is she charged with fraud, collusion, bad faith or malfeasance in the administration of the estate. The sole issue is whether she acted as an ordinary prudent person in the performance of her duties. It is obvious that Mrs. Dorn made no attempt to marshal the assets of the estate; that she offered no supervision over Halstead's activities; that she had no knowledge of what the estate consisted and made no attempt to gain such knowledge; and that she did little more than make casual inquiries as to the progress of the administration of the estate and was satisfied with Halstead's replies to the effect "Everything is coming along fine and will be closed soon." In short, she totally abdicated her duties as administratrix in favor of Halstead. Therefore, we agree with the conclusion of the trial court that Mrs. Dorn was negligent in her administration of the estate.
Mrs. Dorn as administratrix was under a non-delegable duty to collect and preserve the estate assets. Speakman v. Tatem, 48 N.J. Eq. 136, 149 (Ch. 1891), affirmed 50 N.J. Eq. 484 (E. & A. 1892); Travers v. Reid, 119 N.J. Eq. 416, 418 (Ch. 1936). See 2 Scott, Trustee (2d ed. 1956), § 175. She had the duty to actively supervise the administration of the estate by Halstead. Professor Scott discusses the applicable rule in these terms:
"[The trustee] is liable if he improperly delegates to an agent the performance of acts which he was under a duty personally to perform. He is liable for the acts of an agent employed by him in the administration of the trust, if he did not use reasonable care in the selection or retention of the agent. The trustee is liable for acts of the agent if the trustee has failed to exercise proper supervision over the conduct of the agent. He is liable if he unnecessarily entrusts money or securities of the trust or title deeds or other property to an agent, or permits the agent unnecessarily to retain the property, with the result that the agent misappropriates it." 2 Scott, Trusts (2d ed. 1956), § 225.1.
*482 The decision in Kaufman v. Kaufman's Adm'r., 292 Ky. 351, 166 S.W.2d 860, 144 A.L.R. 866 (Ct. App. 1942), is also persuasive authority for the imposition of liability upon a fiduciary who totally abdicates his duties. There the administrator was also a man of limited business experience, who reluctantly accepted the appointment at the request of other beneficiaries of the estate. There, as here, he relied entirely upon a reputable attorney for the complete administration of the estate and permitted the attorney to collect and retain estate assets for an extended period of time. It was discovered that the attorney had embezzled these assets. In surcharging the administrator the court said at page 863 of 166 S.W.2d:
"And it is the generally accepted view that an administrator is not personally liable for loss through his lawyer's misconduct, negligence or nonfeasance if he exercised due prudence in the selection of the lawyer. 24 C.J. 126. But this necessary authority cannot extend to the surrender of all the duties of the trust or the delegation of all functions without becoming responsible to distributees for any loss sustained. Schouler, Section 2258; 24 C.J. 126. `The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform.' Thus, he cannot properly commit the entire administration of the trust to an agent or other person unless he is permitted to do so by the terms of the trust. Restatement of Law of Trusts, A.L.I., Sec. 171. If he does that without such permission and loss results he is responsible for it.
Under similar states of fact, it is generally held that an administrator permitting an attorney to retain for several years money of the estate collected by him without any effort to recover it from the attorney is liable for its loss to the estate. Note, 24 C.J. 126, citing Abercrombie v. Skinner, 42 Ala. 633; Reilly v. Porcher, 46 App. Div. 290, 61 N.Y.S. 662; Cheever v. Ellis, 134 Mich. 645, 96 N.W. 1067. See also In re Beer, Sur., 124 N.Y.S. 423; In re Chandler's Estate, 136 Or. 128, 297 P. 841."
The appellants rely upon In re Leonard, 107 N.J. Eq. 235 (E. & A. 1930), in which a guardian turned over a sum of money to an attorney to close a mortgage covering property owned by the attorney's mother. The attorney forged his mother's signature on the bond and mortgage and subsequently absconded. The sole criticism made by the exceptants was that the guardian should have given the *483 attorney a check payable to the mortgagor rather than cash. The court found, however, that in mortgage closings the loan is as frequently paid in cash as by check and held that the guardian had acted with the sense and discretion which she would have used in her private affairs in giving cash to the attorney. The court further found that the guardian was justified in relying upon the assistance of a supposedly competent attorney and thus was not liable for the ensuing loss. The court noted, however, that the rule would be otherwise where the loss was occasioned by the fiduciary's "gross carelessness or indifference to duty."
In the present case it may fairly be said that Mrs. Dorn's total abdication was equivalent to "gross carelessness or indifference to duty."
While a fiduciary, who in good faith and with the sense and discretion that he would use in his own affairs, relies upon the advice of a reputable attorney is not liable for any loss occasioned by any error or criminal conduct of the attorney, Heisler v. Sharp's Ex'rs, 44 N.J. Eq. 167 (Prerog. 1888), affirmed Heisler v. Prickett, 45 N.J. Eq. 367 (E. & A. 1889); In re Sharp's Estate, 61 N.J. Eq. 601 (Prerog. 1900); In re Slater's Estate, 88 N.J. Eq. 296 (Prerog. 1917); In re Leonard, supra, the rule is otherwise where, as in this case, the fiduciary surrenders all of her duties to the attorney and exercises no effective supervision whatsoever over his activities. In these circumstances, she cannot be said to have exercised that degree of care, prudence, circumspection and foresight that an ordinary prudent person would employ in like matters of her own, In re Koretzky's Estate, supra, and is answerable for any losses which proximately result therefrom. If it could be fairly said that the entire loss resulted from her unnecessarily permitting Halstead to retain the estate assets without adequate supervision, we think the rule in the Kaufman case, supra, would apply. But can it be said that Mrs. Dorn's negligence was the sole cause of the entire loss sustained by the estate?
The respondents contend that the "informal account" on its face showed the aggregate value of the estate to be in *484 excess of $40,000 and, therefore, a reasonably prudent person who received such notice would have attempted to learn the nature and location of the assets listed therein in order to diligently marshal them. They assert that the fact that this account used the term "Sundries" to account for cash and a mortgage known to be in Halstead's possession is no excuse for Mrs. Dorn's failure to inquire of her predecessor fiduciaries as to the meaning of this term. They also contend that the failure of the co-administrators to mention the fact that Halstead may possibly have converted the proceeds of the Varcadipane mortgage is no defense to Mrs. Dorn's failure to inquire of the mortgagors as to the balance due, since it was listed as open of record and the bond and mortgage were accounted for as assets of the estate.
While we agree that Mrs. Dorn was derelict in failing to attempt to marshal the assets and in entrusting the entire administration of the estate to Halstead, we think that the respondents' argument overlooks the fiduciary duty imposed upon the prior administrators as court-appointed officers. In making this observation, we realize that the co-administrators were not made parties to this suit and that the trial court in reaching its decision considered only the fiduciary duty owed by Mrs. Dorn. However, we feel that the facts in this case reveal the inherent injustice in the trial court's otherwise correct decision. Consequently, we feel constrained to invoke the inherent power of this court to exercise supervision over the performance of the fiduciary duties of court-appointed officers. We think that such a measure is justified in this case. In Laun v. Kipp, 155 Wis. 347, 145 N.W. 183, 5 A.L.R. 655 (Sup. Ct. 1914), Justice Marshall made this observation concerning the powers of a court:
"It is the crowning merit of our system that, so far as power is concerned, it is as limitless as the capacity of man to wrong a fellow man. Courts may well proceed with great care in exercising their supreme authority outside of the field of ordinary judicial activity, but should never doubt or suggest want of power to deal with any situation where otherwise one person would be seriously injured by another in his person or property. The judicial arm of the people stands for its whole sovereign authority in that field, *485 and so, in the very nature of things, must, in the final analysis, be limited only by the boundaries of justice and be taken as infallible as regards what is just under all the circumstances of any particular situation."
A fiduciary who has entered upon the administration of his duties cannot divest himself of his responsibility and gain his discharge by his own act of resigning. In re Loree's Trust Estate, 24 N.J. Super. 604, 609 (Ch. Div. 1954); Clapp, Wills and Administration, sec. 484; 1 Scott, Trusts (2d ed. 1956), § 106.1. N.J.S. 3A:11-1 provides in part:
"A fiduciary may be discharged from the further duties of his office by the court to which he is accountable.
The court shall examine into the matters and if sufficient cause appears, the court may grant the discharge unless it will be prejudicial to the estate or persons interested therein or for any other reason the discharge ought not to be granted.
A discharge so granted shall discharge the fiduciary of all the further duties of his office except accounting for and paying over the money and assets with which he is chargeable by virtue of his office."
While this statute grants a court the discretionary power to permit a fiduciary to voluntarily gain his discharge upon "accounting for and paying over the money and assets with which he is chargeable," it must be read in conjunction with N.J.S. 3A:6-58, supra, which requires a discharged fiduciary to "state and settle his account before the * * * court." Regardless of the fact that the court's order of May 3, 1955, by its terms, permitted either a formal or informal accounting, the co-administrators were under a duty to make a full disclosure to the court of all the relevant facts concerning the administration of the estate and were chargeable with knowledge of the provisions of N.J.S. 3A:6-58 which makes a formal account before the court mandatory. Even if an informal account was authorized by law, the prior administrators, as fiduciaries, owed a duty to make a full disclosure in their account to their successor. If a full disclosure had been made, Halstead may have been prevented from ever gaining control of this estate. The court in the *486 Laun case, supra, made the following observation in regard to a fiduciary's duty of disclosure to his successor:
"Here the respondent * * * owed to appellants the active duty, independently of any litigation, to make a full disclosure of his transactions as trustee. That duty he owed, in a high degree, in the litigation, and also he owed the duty of making such disclosure to the court and to its referee."
We do not presume to pass upon whether or not the prior administrators failed to comply with the duty imposed upon them by virtue of their appointed office, since they were not parties to the suit below and have not been extended the opportunity to be heard. However, it is the opinion of the court that the judgment rendered below cannot, in light of the circumstances present in this case, be conclusive as to the liability of the successor fiduciary. In order that full justice be done, a new trial must be held to determine whether the prior administrators did in fact fail to disclose their knowledge of the possible misconduct of Halstead to their successor fiduciary, who they knew had retained Halstead as her attorney. It appears to this court that such a determination is essential in assessing the liability for the loss of any or all of the estate assets, since if a full disclosure were made it might have prevented Halstead from gaining control of the estate assets. Accordingly, we hold that the case must be remanded, and in the exercise of the inherent power of the court we direct Mrs. Dorn to join the co-administrators as third-party defendants to determine whether it was her negligence or whether it was their failure to make a full disclosure that proximately occasioned the loss of the respective assets of the estate, or whether such loss was due to the combined fault of both parties. Inquiry should also be made as to the effect to be given to the release executed by Mrs. Dorn to the co-administrators.
Since the case is to be remanded, one further point must be discussed.
The appellants have urged on this appeal that "in the absence of evidence of [the] solvency of Halstead or *487 other facts to establish an ability to recover this sum, there is lacking the element of proximate cause." The issue of Halstead's financial condition was not mentioned in the pretrial order and no evidence in regard to his solvency or insolvency was adduced or offered by either of the parties at the trial below. It is apparent, then, that the appellants' argument presupposes that the burden of establishing the solvency of Halstead, or the collectibility of the claims against him, rested upon the respondents as an essential element of their case.
While we have found no cases in this State dealing with the precise point, in Bankers Trust Co. v. Bacot, 6 N.J. 426, 443 (1951), Justice Burling, in dealing with the liability of a trustee who had failed to make an effort to collect a deficiency judgment, stated:
"Since the trustee has conceded that the burden was upon it to establish its inability to collect deficiency judgments, and since no evidence appears which would excuse its failure to collect on these two judgments which were entered in 1933 it follows that the trustee should be surcharged for the losses sustained through its dereliction."
See also In re Atkinson's Estate, 86 N.J. Eq. 173, 174 (E. & A. 1916); Clapp, Wills and Administration, sec. 748; 2 Kocher, New Jersey Probate Law, page 867 (1916). Professor Scott, in dealing with the duty of a trustee, states the rule in these terms:
"If the trustee has made no effort to collect the claim, however, the burden is upon him to show that such effort would have been unavailing." 2 Scott, Trusts (2d ed. 1956), § 177.
In attempting to distribute the relative burdens of proof there is no universal method of apportionment that will apply to all cases. Professor Wigmore in discussing this problem makes this observation:
"The truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in different situations." 9 Wigmore, Evidence (3d ed. 1940), § 2486.
*488 Accordingly, we hold that where a fiduciary has a duty to collect and preserve the assets of an estate and he makes no effort to recover an estate asset or claim, the burden rests upon him to establish the insolvency of the estate debtor in order to show that no loss resulted to the estate from his failure to attempt to recover the asset or enforce the claim.
There is no merit in the appellants' contention that the respondents did not prove the necessary elements of their cause of action for negligence. If upon remand the issue of Halstead's financial condition is raised, the burden will rest upon the appellants to establish his insolvency. It should be observed, however, that the defense of uncollectibility would not be available to Mrs. Dorn as to the loss of any assets which she entrusted to Halstead after her appointment. A fiduciary who unnecessarily permits an agent to retain estate assets, which are subsequently stolen by the agent, cannot assert the insolvency of such an agent in order to avoid liability. In such a situation the insolvency of the agent cannot be said to be the proximate cause of the loss.
The case is reversed and remanded for a new trial in accordance with the views expressed above.
For reversal and remandment  Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR  7.
For affirmance  None.